1998-NMCA-009

952 P.2d 450

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Melvin DARTEZ, Defendant–Appellant.**

**No. 17104.**

Court of Appeals of New Mexico.

Oct. 14, 1997.

Certiorari Denied Jan. 8, 1998.

Tom Udall, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

Tova Indritz, Albuquerque, for Defendant–Appellant.

*OPINION*

ALARID, Judge.

1. Defendant appeals his convictions for one consolidated count of misappropriation of public assistance and six counts of tampering with public records. On appeal, Defendant raises the following issues: (1) whether there was sufficient evidence to support the misappropriation of public assistance counts, because Defendant was not a public employee; (2) whether there was sufficient evidence to support the tampering with public records counts, because the Medicaid cards were not public records; (3) whether fundamental error occurred based on the admission of evidence regarding Defendant's prior drug sales; (4) whether the prosecutor's references to Defendant's prior drug sales and comments on Defendant's character in opening statement and closing argument constituted prosecutorial misconduct; (5) whether Defendant received ineffective assistance of counsel; (6) whether the trial court erred in refusing to instruct the jury on entrapment; (7) whether the trial court erred in refusing to instruct the jury on Medicaid fraud as a lesser-included offense; (8) whether the misappropriation sentence must merge with the tampering sentence; and (9) whether the six counts of tampering with public records merge into one count.

2. We hold that as a matter of law Defendant is not a public employee; therefore, we reverse his conviction for misappropriating public assistance. We further conclude that Defendant has made a prima facie showing of ineffective assistance of counsel, thus, we remand for an evidentiary hearing before the trial court for a determination of whether Defendant received ineffective assistance of counsel at trial.

*MOTION TO STRIKE OR DISREGARD*

3. The State has moved to strike or disregard a portion of Defendant's reply brief. The State contends that the argument in question in the reply brief should be disregarded because that argument was not advanced in the brief in chief in accordance with Rule 12–213, NMRA 1997. In its answer brief, the State contends that Defendant raised the defense of entrapment, and that certain otherwise objectionable character evidence was admissible as rebuttal of this defense. The portion of the reply brief the State urges this Court to strike is responsive to an argument made by the State in its answer brief. Therefore, we deny the State's motion to strike or disregard.

*FACTS*

4. Defendant was charged by criminal information with six counts of misappropriating public assistance, in violation of NMSA 1978, § 30–40–3(A) (1987) and six counts of tampering with public records, in violation of NMSA 1978, § 30–26–1(E) (1963). Defendant was tried before a jury.

5. Defendant, his wife, and their eight children (the Dartezes) were living in Bernalillo, New Mexico, in late 1994 and early 1995. They received $995 per month in assistance through Aid to Families with Dependent Children (AFDC). The Dartezes were part of the AFDC Unemployed Parents Program. This program requires the parent determined to be the primary wage earner to actively seek employment. If that parent has not found work within six weeks, he or she is enrolled as a participant in Project Forward.

6. Participants in Project Forward must undergo a program of counseling and orientation, and then are placed in a position for work experience, with the idea that the person will also actively seek employment elsewhere. The Human Services Department (HSD) has contracts with both public agencies and private firms for placement of Project Forward participants. Defendant was placed with the Bernalillo County HSD In-

come Support Division and was expected to work there at least 20 hours a week as a "workfare" participant.

7. While working at HSD Defendant had access to Medicaid cards that had been returned by the Post Office to HSD as undeliverable. On February 7, 1995, Defendant sold six Medicaid cards for $150 to Jerry Montoya, a state drug inspector for the New Mexico Board of Pharmacy, and Joseph Montano, an investigator of the New Mexico Attorney General's Medicaid Fraud Control Unit. Defendant was arrested the following day.

8. The jury merged the six counts of misappropriation of public assistance, and found Defendant guilty of one count of misappropriation of public assistance and six counts of tampering with public records. The trial court ruled that the six counts of tampering merged into one count, and sentenced Defendant to eighteen months on that count. Defendant was also sentenced to eighteen months on the misappropriation count, the sentence to run consecutive to the tampering sentence. After adjudication as a habitual offender, four years were added to the sentence for a total sentence of seven years.

*DISCUSSION*

**MISAPPROPRIATION OF PUBLIC ASSISTANCE**

9. Defendant claims that there was insufficient evidence to convict him on the charges of misappropriation of public assistance because the trial court should have decided as a matter of law that he was not a "public employee." A "public employee" is defined in the criminal code as "any person receiving remuneration for regular services rendered to the state or any of its political subdivisions." NMSA 1978, § 30–1–12(J) (1963). The jury instructions included this definition of public employee. In order to determine whether Defendant was receiving remuneration for regular services rendered to HSD, we look to the relationship established pursuant to the Project Forward Program in which Defendant was a participant.

10. Since HSD mandates that one of the parents undergo work experience in order to retain benefits for the family, agencies and businesses accepting workers sign a Community Work Experience Training Agreement with HSD. The agreement states:

4. That participants are not employees of the training/work site and will receive no compensation or employee benefits from the training/work site.

The training/work site does not pay the workers, and HSD Project Forward has explicitly agreed that the workers are not employees of the training/work site. The only agreements are between the worker and HSD and HSD and the training/work site. HSD sets the minimum hours that the worker must work and provides workers' compensation benefits. The training/work site, on the other hand, gives the worker assignments, supervises the worker, and has the right to control what the worker does and when it is to be done.

11. Many aspects typically expected of an employer-employee relationship are absent under this arrangement. Participants do not receive a salary, vacation or sick leave. Benefits are determined by family size, lack of income and other assets, not by qualifications or job duties. Additionally, workfare participants do not qualify for retirement programs. This creates a unique work situation where the incidents of an employer-employee relationship are mixed among the three participating entities.

12. The New Mexico Supreme Court in *Benavidez v. Sierra Blanca Motors*, 1996 NMSC 045, 122 N.M. 209, 922 P.2d 1205, provides further guidance for our analysis of whether Defendant should be considered an employee of HSD. There the Court considered the question whether a prisoner participating in an inmate-release program who is injured while performing work at a private job site may be considered an employee of that private business entitled to workers' compensation benefits under the New Mexico Workers' Compensation Act. *Id.* 1996 NMSC 045, 122 N.M. at 210, 922 P.2d at 1206.

13. In determining whether the prisoner was an employee, the Court first looked at whether the prisoner's obligation to provide work was voluntary. *Id.* at 211–12, 922 P.2d

at 1207–08; *cf. Joyce v. Pecos Benedictine Monastery,* 119 N.M. 764, 767, 895 P.2d 286, 289 (Ct.App.1995) (in order to establish a contract of hire, "there must be mutual assent, express or implied."). The Court overruled *Scott v. City of Hobbs,* 69 N.M. 330, 332, 366 P.2d 854, 856 (1961) *overruled by Benavidez v. Sierra Blanca Motors,* 122 N.M. 209, 922 P.2d 1205 (1996), which held that a prisoner who worked for the city under an ordinance requiring that judges order physically-fit prisoners to work in exchange for credit on his fine was not entitled to workers' compensation benefits for injuries sustained by him while working for the city. In *Scott* community service could be involuntarily imposed, while under the present statutory scheme prisoners are allowed "to volunteer to work for private employers at going market rates." *Benavidez,* 122 N.M. at 213, 922 P.2d at 1209. *Scott* was overruled insofar as it holds that a prisoner's status as an inmate precluded the existence of an employer-employee relationship for the purposes of workers' compensation, but appears to still be good law insofar as it holds that work must be voluntary for an employment relationship to exist. *See Benavidez,* 122 N.M. at 215, 922 P.2d at 1211.

14. In this case, Defendant was required to work as a workfare participant with the Project Forward Program. If Defendant declined to participate in this program, his wife would be required to participate in order to continue the family's AFDC benefits. If his wife also declined to participate, the AFDC benefits would be terminated. Under these circumstances, the work for HSD by Defendant cannot reasonably be characterized as voluntary. Instead, Defendant was compelled to work in order to receive AFDC benefits for his family.

15. The Supreme Court of Rhode Island in *Durand v. City of Woonsocket,* 537 A.2d 129 (R.I.1988), reviewed a similar question regarding whether work was voluntary. In *Durand* the Court held that a participant in a state-mandated workfare program was not an employee for purposes of workers' compensation. *Id.* The Court agreed with the ruling below that "petitioner did not establish a contract for hire and that the relationship between the parties was not voluntary." *Id.* Similarly, in the present case, the relationship between Defendant and HSD was not voluntary.

16. The question of whether Defendant was a public employee also requires a determination of whether government benefits are remuneration for services provided by workfare participants. Other courts have held that workfare participants earn for their services "not remuneration but rather continued eligibility for receiving general assistance[.]" *Radvanovsky v. Maine Dep't of Manpower Affairs Employment Sec. Comm'n,* 427 A.2d 961, 963 (Me.1981) (holding that assistance payments could not be considered for the purpose of requalification for unemployment insurance); *see also Closson v. Town of Southwest Harbor,* 512 A.2d 1028, 1030 (Me. 1986) (holding that a workfare participant is not an employee of a municipality for the purposes of workers' compensation, because participant neither received nor could have expected to receive remuneration or wages for the services that he performs); *Durand,* 537 A.2d at 131 ("[T]he source of money received by petitioner was a grant of public funds, and therefore, the money could not be characterized as wages or remuneration."). We agree with these courts and hold that workfare participants under the current system do not receive "remuneration" for the work they perform pursuant to the Project Forward Program.

17. Because we conclude that work performed by workfare participants cannot be characterized as voluntary, and workfare participants do not receive "remuneration" for services performed, we hold as a matter of law that Defendant was not a public employee. Accordingly, Defendant's conviction for misappropriation of public assistance is reversed.

## TAMPERING WITH PUBLIC RECORDS

18. Defendant also argues that there was insufficient evidence that the Medicaid cards in question were "public records" at the time they were taken, consequently, he could not be convicted of tampering with public records. In order to return a verdict of guilty of tampering with public records,

the jury was instructed that it must find that Defendant knowingly removed a public record and/or public document specifically, a State of New Mexico medical identification card. The jury was also instructed that a public document is "any document or record, evidencing or connected with the public business or the administration of public affairs, preserved in or issued by any department of the government."

19. There was testimony that the Medicaid cards were public documents owned by the State of New Mexico. Defendant does not contend that the cards were not public documents. Instead, he argues that there was insufficient evidence that the cards were public records. Defendant's argument fails because the evidence need not support all alternative bases of conviction. The State elicited testimony that the cards were public documents. The State need not prove that the cards were also public records. "Due process does not require a guilty verdict to be set aside if an alternative basis of conviction is only factually inadequate to support a conviction." *State v. Olguin,* 120 N.M. 740, 741, 906 P.2d 731, 732 (1995). Accordingly, we need not reverse Defendant's conviction for tampering with public records on the ground of insufficient evidence.

## FUNDAMENTAL ERROR, PLAIN ERROR, AND PROSECUTORIAL MISCONDUCT

20. Defendant contends that fundamental error or plain error resulted from the admission of evidence regarding his involvement with drug sales. Alternatively, he argues that the prosecutor's references to his involvement with drug sales and comments on Defendant's character during opening statement and closing argument constituted prosecutorial misconduct warranting reversal and remand for a new trial.

21. Fundamental error and plain error may be applied in cases where the errors complained of were not brought to the attention of the trial court. *See* Rule 12–216(B)(2), NMRA 1997 and Rule 11–103(D), NMRA 1997. The rule of fundamental error applies "only if there has been a miscarriage

of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco,* 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992). The rule of plain error applies to errors that affect substantial rights of the accused and only applies to evidentiary matters. *State v. Lucero,* 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993).

22. Whether this Court reviews for fundamental error or plain error, it "must be convinced that admission of the testimony constituted an injustice that creates grave doubts concerning the validity of the verdict." *State v. Barraza,* 110 N.M. 45, 49, 791 P.2d 799, 803 (Ct.App.1990). In order to rise to the level of fundamental error, there must be a "reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *State v. Clark,* 108 N.M. 288, 303, 772 P.2d 322, 337 (1989) *overruled on other grounds by State v. Henderson,* 109 N.M. 655, 789 P.2d 603 (1990).

23. In this case, there was ample evidence presented by the State that Defendant sold six Medicaid cards to two undercover officers. There was no conflicting evidence as to Defendant's guilt presented to the jury because Defendant did not present any witnesses. Under these circumstances, we are not convinced that admission of the evidence of Defendant's involvement with drug sales constituted an injustice that creates grave doubts concerning the validity of the verdict. We cannot say that the question of guilt in this case is so questionable that it would shock the conscience to permit the conviction to stand. Therefore, we reject Defendant's claims of fundamental and plain error.

24. Similarly, with respect to Defendant's claim of prosecutorial misconduct, this is not a case where Defendant objected to certain testimony or where the trial court directed the prosecutor to avoid a certain subject matter and the prosecutor violated that directive. *Cf. State v. Breit,* 1996 NMSC 067, ¶ 42, 122 N.M. 655, 930 P.2d 792 (prosecutorial misconduct found where pros-

ecutor ignored direct admonitions from trial court, and despite objections being raised and sustained, prosecutor continued to solicit irrelevant testimony). *State v. Wilson*, 109 N.M. 541, 547, 787 P.2d 821, 827 (1990) (prosecutorial misconduct found where prosecutor had adequate warning, from trial court's orders on pretrial motions and rulings made during trial, not to intrude into sensitive subject area). Under the circumstances of this case, where defense counsel did not object to the prosecutor's testimony or comments, we are not persuaded that the prosecutor's comments rose to the level of prosecutorial misconduct warranting reversal.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

25. Defendant claims that trial counsel rendered ineffective assistance of counsel when he: (1) filed all pretrial motions late; (2) failed to interview or subpoena the confidential informant; (3) failed to object to the prosecutor's argument that Defendant had been involved with selling drugs and was a person of bad character; and (4) failed to object to the admission of evidence that Defendant had sold drugs.

26. The issue on appeal is whether "the record on appeal establishes a prima facie case of ineffective assistance." *State v. Swavola*, 114 N.M. 472, 475, 840 P.2d 1238, 1241 (Ct.App.1992). A prima facie case of ineffective assistance is made by showing that defense "counsel's performance fell below the standard of a reasonably competent attorney and, due to the deficient performance, the defense was prejudiced." *State v. Crislip*, 109 N.M. 351, 353–54, 785 P.2d 262, 264–65 (Ct.App.1989). A prima facie case is not made if there is a plausible, rational strategy or tactic to explain counsel's conduct. *State v. Richardson*, 114 N.M. 725, 729, 845 P.2d 819, 823 (Ct.App.1992). In order to establish prejudice, the defendant must show that there is a reasonable probability that, but for his or her attorney's errors, the result of the proceeding would have been different. *State v. Brazeal*, 109 N.M. 752, 757–58, 790 P.2d 1033, 1038–39 (Ct.App. 1990).

27. Counsel's failure to timely file pretrial motions and failure to interview the confidential informant did not constitute ineffective assistance. Some of the pretrial motions were in fact ruled on, and the court explained why it would have ruled against the remaining motions on the merits. Thus, there was no prejudice from the failure to file the motions in a timely manner. Likewise, Defendant has not demonstrated that he was prejudiced by counsel's failure to interview or subpoena the confidential informant. There is no indication in the record or transcripts regarding what the confidential informant might have offered as testimony that would have benefitted Defendant.

28. However, we are concerned about whether a reasonably competent attorney would have objected to admission of the extensive evidence pertaining to Defendant's involvement with drugs and the prosecutor's comments regarding Defendant's character during opening statement and closing argument. This Court has recognized that the admission of prior bad acts evidence is highly prejudicial. *See State v. Wrighter*, 1996 NMCA 077, ¶¶ 11–13, 122 N.M. 200, 922 P.2d 582 (unfair prejudice from testimony that defendant had sold witness drugs in the past substantially outweighed its probative value and was excluded under Rule 11–403).

29. When the prosecutor asked about the price of a certain drug, trial counsel did object on the grounds of relevance. Trial counsel made this objection at the end of the portion of Montoya's testimony about the five drug sales Defendant had made to him. The objection was sustained. In light of this objection, it might appear that the failure to object to other questions and comments was possibly a trial tactic and, thus, was not ineffective assistance of counsel. *See State v. Jordan*, 116 N.M. 76, 81, 860 P.2d 206, 211 (Ct.App.1993) ("In determining whether counsel was ineffective, this Court will not second-guess matters of trial strategy or tactics.").

30. However, this is not a case where there was one isolated reference made in passing to Defendant's involvement with the sale of drugs. As illustrated by the attached

appendix, the prosecutor elicited testimony that explained Defendant's alleged prior sales of drugs in extensive detail, including evidence regarding the types of drugs sold, the quantities of drugs sold or offered for sale, and the use and dangerousness of specific drugs.

31. We are also concerned about the way this testimony was used by the prosecutor in opening statement and closing argument. The prosecutor emphasized in her opening statement that Defendant "lives his life violating the law to get by rather than following it." The following comments were made by the prosecutor in closing argument:

But all these things, they didn't satisfy Mr. Dartez, because, as I said, he's a man who lives outside the rest of us. He's a man who also, having all these things illegally; sold anabolic steroids on at least two or three occasions. He illegally sold cocaine. He illegally sold Valium. He illegally took and sold six Medicaid cards, which is the case we're here on today, and perhaps was even selling TVs.

He wasn't satisfied with what he had. He had to get a little more, get a little more money, get a few more drugs, and that's how he lives. The evidence is clear and uncontroverted which means it's uncontradicted from that witness chair. It shows that he dealt at least four or five occasions in illegally type of what we call controlled substances; that could be either illegal or legal drugs, legal drugs that you have to get through a prescription.

It is difficult to understand how a competent trial attorney would not object to this seemingly improper argument, which implied essentially that the jury should convict Defendant because he lived outside the law, insofar as he had engaged in numerous illegal drug sales in the past.

32. The State argues that evidence of past drug sales committed by Defendant is admissible to rebut Defendant's defense of entrapment. New Mexico recognizes both the subjective defense of entrapment, which focuses on the defendant's lack of predisposition, and the objective defense of entrapment, which focuses on improper police inducements and conduct. *State v. Buendia,*

1996 NMCA 027, 121 N.M. 408, 912 P.2d 284. Predisposition evidence is relevant to a defense of subjective entrapment. *See State v. Fiechter,* 89 N.M. 74, 77, 547 P.2d 557, 560 (1976); *see also State v. Vallejos,* 1997 NMSC 040, ¶ 5, 123 N.M. 739, 945 P.2d 957. The State contends that under either subjective or objective entrapment, evidence on the defendant's predisposition to commit the crime is admissible.

33. Our Supreme Court recently settled the question whether the subjective predisposition of a defendant is relevant to a claim of objective entrapment. *Vallejos,* 1997 NMSC 040, ¶ 2, 123 N.M. 739, 945 P.2d 957. In *Vallejos,* the Court held that when a defendant asserts the defense of objective entrapment the factfinder must determine whether police conduct created a substantial risk that an ordinary person would have been caused to commit the crime, and that a defendant's predisposition is not relevant to this factual inquiry. *Id.* The Supreme Court clarified objective entrapment as being either factual or normative.

[I]f a jury finds as a matter of fact that police conduct created a substantial risk that an ordinary person not predisposed to commit a particular crime would have been caused to commit that crime, *or* if the trial court rules as a matter of law that police conduct exceeded the standards of proper investigation, then criminal charges should be dismissed.

*Vallejos,* 1997 NMSC 040, ¶ 11, 123 N.M. 739, 945 P.2d 957.

34. In this case, the evidence of prior criminal conduct and comment on that conduct was brought out by the State and is quite extensive and detailed. Accordingly, we hold that Defendant has made a prima facie showing of ineffective assistance of counsel based on trial counsel's failure to object to testimony elicited by and comments made by the prosecutor regarding the details of Defendant's prior sales of drugs. We further hold that the evidence and comments were prejudicial. Therefore, we remand to the trial court to hold an evidentiary hearing to determine if there was a plausible reason for not objecting to the evidence and the prosecutor's comments on the evidence. *See*

*Richardson*, 114 N.M. at 729, 845 P.2d at 823 (where prima facie case of ineffective assistance of counsel is established, it is appropriate to remand to the trial court for an evidentiary hearing to determine the motivation for the acts or omissions of the particular attorney).

35. If the trial court finds that the failure to object was based on plausible trial tactics and strategy, and thus did not amount to ineffective assistance of counsel, Defendant's conviction for tampering with public records shall be affirmed. If the trial court concludes that the failure to object amounted to ineffective assistance of counsel, Defendant's conviction for tampering with public records shall be reversed and Defendant may be retried. For the reasons set out below, if retrial occurs, Defendant can only be retried on one count of tampering with public records.

**REFUSAL TO INSTRUCT JURY ON ENTRAPMENT**

36. Defendant argues that the trial court erred in not instructing the jury on entrapment. In his brief in chief, Defendant contends that he "sought to raise a defense of objective entrapment." It is clear, however, from the instruction proffered and trial counsel's argument on the instruction that he requested instructions on both subjective and objective entrapment. The requested instruction was based on UJI 14–5160, NMRA 1997. Defendant's requested instruction included the language for both subjective and objective entrapment. Thus we examine whether Defendant was entitled to an instruction under either theory.

37. A defendant is entitled to an instruction on his theory of the case if there is evidence to support it. *State v. Castrillo*, 112 N.M. 766, 769, 819 P.2d 1324, 1327 (1991). *See State v. Rodriguez*, 107 N.M. 611, 616, 762 P.2d 898, 903 (Ct.App.1988). The defense did not present a case, so any evidence of entrapment must be derived from the State's case in chief and from cross-examination of the State's witnesses. *Rodriguez*, 107 N.M. at 616, 762 P.2d at 903.

38. The State presented evidence that the State Drug Inspector for the Board of Pharmacy received a call from a confidential informant stating that Defendant was selling Medicaid eligibility cards. The Inspector contacted Defendant "and asked him if we could get together and discuss some business, and that this person had told me that he might be able to help me get some ID cards." Without further persuasion, Defendant suggested that they meet two days later. The Inspector and an Investigator from the Attorney General's Fraud Unit arrived at the appointed meeting place where they saw Defendant walking along the street. They waved Defendant over to the vehicle and he got in the back seat. During the course of the discussion Defendant raised the subject of using Medicaid ID's to obtain drugs. When he was told that they didn't have any ID's Defendant responded, "Well, if you would have told me so, I could have brought you some right now." Defendant was then asked to get ten cards, with an offer of payment of a dollar for each card. Defendant said that he would contact them at a later date to give them a price, because he had to wait to get the cards. Defendant called the Inspector and asked him when he was going to come by. At the second meeting later the same day, Defendant said he had only been able to get six cards and handed the cards to Montoya. Defendant said that he was going to sell them ten cards for $300, but since there were only six cards the price would be $150. On cross-examination, defense counsel reconfirmed that Montoya had initiated the contact with Defendant, and Montoya had gone to Defendant's home twice to pick him up.

39. This evidence was not sufficient to establish that law enforcement officials unfairly caused the commission of the crime. All they did was give Defendant the opportunity to commit the crime. "Where the evidence presented indicates that defendant merely was given an opportunity to commit a crime and that no undue persuasion or enticement was utilized, there is no factual basis for a claim of entrapment." *Rodriguez*, 107 N.M. at 616, 762 P.2d at 903. There was no evidence presented in this case of undue persuasion or enticement, nor any evidence that the police had exceeded the standards of

proper investigation, and therefore we hold that the trial court correctly refused to instruct the jury on entrapment. *See Vallejos,* 1997 NMSC 040, ¶ 38, 123 N.M. 739, 945 P.2d 957 (holding that defendant was not entitled to entrapment instruction when there was insufficient evidence to support such an instruction).

## REFUSAL TO INSTRUCT ON MEDIC-AID FRAUD AS A LESSER–INCLUDED OFFENSE

40. Defendant argues that the trial court erred by refusing to instruct the jury on Medicaid fraud in violation of NMSA 1978, § 30–44–7(A)(2)(a) (1989, prior to the 1997 amendment). Section 30–44–7(A)(2)(a) states that "Medicaid fraud consists of: providing with intent that a claim be relied upon for the expenditure of public money: treatment, services, or goods that have not been ordered by a treating physician[.]" A defendant is entitled to a lesser-included offense instruction upon a showing of evidence tending to establish the lesser-included offense. *State v. Meadors,* 1995 NMSC 081, 121 N.M. 38, 908 P.2d 731. The State argues that, in order to be entitled to a lesser-included offense instruction on Medicaid fraud, Defendant had to present some evidence tending to establish that he provided treatment, a service, or goods that had not been ordered by a treating physician, and that he did so with the intent that the communication identifying the treatment, good, or service as reimbursable under the Medicaid program would be relied upon for the expenditure of public money. We agree that this is the proper standard, and that defendant did not meet his burden.

41. Defendant did not show what the treatment, goods, or services were that he had allegedly provided. The cards themselves do not fall under any of these categories. Evidence that would support a jury charge on Medicaid fraud simply was not presented. Accordingly, the trial court properly rejected Defendant's instruction on Medicaid fraud.

## MERGER OF MISAPPROPRIATION AND TAMPERING CONVICTIONS

42. Defendant contends that his conviction for misappropriation of public assistance must merge with his convictions for tampering with public records. In light of our reversal of Defendant's conviction for misappropriation of public assistance, this issue is moot.

## WHETHER SIX COUNTS OF TAMPERING WITH PUBLIC RECORDS MERGE INTO ONE

43. Defendant claims that his convictions for six separate counts of tampering with public records violates the Double Jeopardy Clause. *State v. Brooks,* 117 N.M. 751, 877 P.2d 557 (1994), is instructive on this issue. In *Brooks,* the Supreme Court held that where the Defendant took cash amounts withheld from a single day's deposit, there was only one offense of larceny as a matter of law, 117 N.M. at 755, 877 P.2d at 561. In so holding, the Court relied on cases that hold that the taking of articles of property from various owners at the same time and place constitutes one offense as a matter of law. *Id.*

44. In the present case, although the jury was instructed on the single-intent doctrine, there was insufficient evidence to support the jury's finding of six different counts of tampering with public records. The evidence established that the six Medicaid cards in question were taken from the same owner, HSD. The State presented evidence that all six cards had been returned in that day's mail (February 7, 1995) and the Defendant had picked up the mail that day from the post office. Under these circumstances, there was insufficient evidence as a matter of law to support six separate convictions for tampering with public records. *Id.*

45. Accordingly, we reverse Defendant's six tampering convictions and remand to the trial court for a determination of whether there was a plausible reason for not objecting to the evidence which led to our conclusion that there was a prima facie case of ineffective assistance of counsel. Again, if the trial court concludes there was a plausible reason, the conviction for tampering with public records shall be affirmed. If the failure to object amounted to ineffective assistance of counsel, the conviction is reversed and Defendant is entitled to a new trial. In the

event the State seeks to retry Defendant, it may only retry him on the one count of tampering with public records. This case is remanded for proceedings consistent with this opinion.

46. **IT IS SO ORDERED.**

WECHSLER and BUSTAMANTE, JJ., concur.

### APPENDIX OF TESTIMONY AND ARGUMENT

*The prosecutor made the following statements during her opening statement:*

"This case that you are about to hear is a case about a man who is outside the law. He isn't a violent man. He isn't necessarily a cruel man, he just lives his life violating the law to get by rather than following it."

"We will show that for a number of months, Mr. Dartez had had contact with a Jerry Montoya who was a State drug inspector, and that the contacts that the Mr. Dartez had had with Mr. Montoya involved the sale of illegal drugs. During that time, Mr. Montoya, the State drug inspector, became aware from a confidential informant that he knew, that Mr. Dartez was not only selling drugs, but that he was selling identification cards, medical identification cards, Medicaid cards and perhaps, false birth certificates."

"Mr. Montano is an investigator in the Medicaid Fraud Control Unit or Medicaid Fraud Division of the Attorney General's Office. He was, our evidence will show, contacted by Mr. Montoya because Mr. Montoya had been dealing mainly with the sale of the illegal drugs and didn't know too much about Medicaid, and therefore contacted the Medicaid Fraud Division."

"And Mr. Montoya and Mr. Montano came to Bernallilo [sic] on February—Excuse me—on January 27th of this year, met Mr. Dartez and talked about not only Mr. Dartez selling them cocaine and lots of cocaine he said he had the access to, but then he began to talk about the availability of Medicaid cards that he could sell to them."

"Evidence will also show that Mr. Dartez bragged to these two agents about using his own Medicaid card to get Valium which he then, he said, 'Yeah, you remember, I got the Valium and I sold it to you.' "

"In fact, you'll even hear evidence that at one point in time, when they were talking about the money for the cards, that Mr. Dartez suggested that he get 10 percent of anything they got off of these Medicaid cards, meaning 10 percent of the drugs that they might sell from using the Medicaid cards."

"I believe that you will see that he's a man who, again, as I've said, he lived on the outside. He doesn't follow the rules. He lives beyond how the rest of us live to get by. And I believe that you will come back with a verdict of guilty to all the counts against Mr. Dartez in this case."

*The first witness for the State was Jerry Montoya. His examination included the following testimony:*

"On several occasions, I purchased both cocaine and legal pharmaceuticals that were furnished to me by Mr. Dartez."

*The prosecutor questioned Montoya at length about these drug transactions:*

Q. You stated that you were acquainted— became acquainted with Mr. Dartez through a confidential informant. Did the confidential informant have anything else to do with your drug dealings with Mr. Dartez after he introduced you to Mr. Dartez?

A. I believe, on occasion, he did. It was not on every occasion, but on some occasions, he did.

Q. Generally, in these prior drug transactions that you had with Mr. Dartez, did he know that you were a certified peace officer?

A. No, he did not.

Q. How would you meet with him?

A. Often Mr. Dartez would page me, or I sometimes would telephone Mr. Dartez at his residence and he would return my call if he was not home.

Q. Okay. Did he have your telephone number?

A. Yes, he did. He had both my cellular telephone number and my pager number.

Q. And these prior transactions, how many of them were there?

A. I believe there was five.

Q. And what kinds of drugs were sold to you by Mr. Dartez?

A. If I may refer to my report?

Q. You don't have any independent recollection of that: is that correct?

A. Just off the top of my head I can say there was Valium and cocaine—

Q. And would you—

A. —and some Anabolic steroids. I don't remember the specific names.

Q. Would you need to refer to your notes to refresh your recollection?

A. Yes, I would.

MS. WATTS [Prosecutor]: Your Honor, may the witness refer to his notes?

THE COURT: Yes, ma'am.

A. On May 11, 1994, there was [sic] three, two milliliter vials of Nandrolone Decanoate.

Q. (By Ms. Watts.) And what is that?

A. That is an Anabolic steroid used by bodybuilders to increase muscle density and size.

Q. Is that a controlled substance?

A. Yes, it is.

Q. One could only get that through a prescription?

A. That's correct.

Q. Is that a dangerous drug?

A. That's correct. Also, on that same occasion, there was one, 10–milliliter vial of testosterone cypionate.

Q. And what is that?

A. That is also a controlled substance and an Anabolic steroid. And on the same instance, there was 51 blue tablets which were a generic form of Diazepam, 10 mili—A generic form of Valium. 10 Milligrams. The generic name is Diazepam.

Q. And Diazepam or Valium, in lay terms, is what?

A. It's a tranquilizer or antianxiety agent.

Q. Is that a drug that is readily abused in the legal drug market?

A. Yes, it is.

Q. What about the Anabolic steroids? Is that also abused?

A. Amongst a certain population, it is.

Q. Any other transactions that you had with Mr. Dartez?

A. On April 21st, 1994, I purchased approximately 3.5 grams of cocaine from Melvin Dartez. On April 12, 1994, I again purchased approximately 3.5 grams of cocaine from Melvin Dartez.

Q. And in these, are there any others—I'm sorry.

A. On April 7, 1994, I purchased two vials of testosterone cypionate.

Q. That's that Anabolic steroid again?

A. That's correct.

Q. In each of these transactions, did the Defendant readily and willingly sell you the drugs?

A. Yes, he did.

Q. Did you in any way force him to sell you the drugs?

A. No.

Q. Did you ever put a gun to his head or get him hooked on the drugs or anything to that effect?

A. No.

Q. And what was, generally, his demeanor when you would have these face-to-face transactions with him?

A. He was very friendly.

Q. Would you exchange money with him?

A. Yes, I would.

Q. How much would an Anabolic steroid tab go for?

DEFENSE COUNSEL: Objection, Your Honor, relevance.

THE COURT: Sustained.

*The prosecutor questioned Montoya about a meeting he had with Defendant and Montano on January 27, 1995:*

Q. And what first—What conversation first started at that meeting?

A. Mr. Dartez told me that he had some cocaine, started talking to me about some cocaine that he had for sale earlier but that he had not been able to contact me, and now, that he was also able to obtain cocaine in kilo quantities now from—

Q. What does that mean, "kilo quantities?"

A. You're talking kilo quantities, kilograms. A kilogram is approximately 2.2 pounds.

Q. So that's a lot of cocaine, right?

A. Correct.

Q. And as he was talking about acquiring this cocaine, what was your response to him?

A. I told him I would have to put that off. I said that I had been working with another organization and I had had all the cocaine I wanted at the time and now I'm kind of backing off and getting into something else, you know.

Q. Did he say where he could get that cocaine?

A. It was in California from some relatives.

Q. Did the conversation stick on cocaine or did it veer off to some other subjects?

A. It had veered off to other drugs that he was able to obtain and how he obtained those.

Q. And specifically, do you recall what other drugs those were?

A. Well, at one point he mentioned the Valium that he had sold me on a previous occasion that he had obtained with his Medicaid card.

Q. And when he mentioned that he had obtained Valium that he had sold you with the Medicaid card, what was your response?

A. Well, just prior to that, in mentioning the Valium, he mentioned the use of Medicaid cards to obtain drugs earlier . . .

Q. Did Melvin Dartez sell any cocaine at that [January 27] meeting?

A. No, he did not.

*The prosecutor also questioned Montoya about a television Defendant had offered for sale:*

Q. Did there come a time when Melvin Dartez contacted you again, or do you remember when the next time [after the January 27 meeting] was he contacted you?

A. Mr. Dartez called me a day or two later offering to sell me a big screen television for $1,000.

Q. Offering to sell you a television. Now, had you ever bought any property from him before?

A. No, I had not.

Q. Did he tell you that it was his?

A. I believe that he told me it was his sister-in-law's.

Q. Did you buy his big screen TV?

A. No, I did not.

Q. Have you ever been given any information that he dealt in stolen property?

A. No, I had not.

*The prosecutor questioned Montoya about his February 7 meeting with Defendant:*

Q. And what was he telling you that you could use those cards to obtain?

A. We could use these cards to obtain prescriptions from doctors, which, in turn, could be taken to pharmacies and cashed, and then we could, in turn, sell the drugs.

Q. Did he ever tell you that he had used his own Medicaid card in that fashion.

A. Yes, he did.

Q. What did he tell you?

A. He told me that he had used his Medicaid to obtain the Valium he had sold to me on a previous occasion.

*On redirect examination of Montoya, the prosecutor asked:*

Q. And then after that meeting on the 27th, where you talked about selling cocaine and you also then talked about the Medicaid cards, when did he contact you again, if you recall?

A.   The next time he contacted me was between January 27th and February 7th when he paged me and I telephoned him back at his residence and he wanted to sell me a big screen color TV.

*The prosecutor questioned Joseph Montano on direct examination about the January 27 meeting with Defendant and Montoya:*

Q.   And what transpired during that meeting with Mr. Dartez?

A.   Mr. Dartez talked—most of his conversation, initially was about prior cocaine deals and how he had family that could deal in kilos of cocaine.  How him and another subject had used Medicaid cards to get drugs then sell the drugs, and how he personally had used his own Medicaid card to buy drugs, to get the drugs and then sell the drugs.

Q.   When was the first mention of Medicaid cards made during that meeting?

A.   After the cocaine, it was Mr. Dartez said he was using his Medicaid card to get the prescription and then he sold the drugs.

*The prosecutor asked Montano if Defendant had told him how to use the cards:*

Montano answered, "Told us he even used—he said, 'I used my own Medicaid card to get some drugs from the pharmacist,' he says. And he said, I believe he said, 'You know, those Valiums I sold you,' talking to Jerry Montoya, Agent Montoya."

*The prosecutor made the following statements in her closing argument:*

"I told you at the very beginning this case, which was only yesterday, that this was a case about a man who really lives outside the law.  You've heard how far outside."

"But all these things, they didn't satisfy Mr. Dartez, because, as I said, he's a man who lives outside of the rest of us.  He's a man who also, having all these things illegally; sold anabolic steroids on at least two or three occasions.  He illegally sold cocaine. He illegally sold Valium.  He illegally took and sold six Medicaid cards, which is the case we're here on today, and perhaps was even selling TVs."

"He wasn't satisfied with what he had.  He had to get a little more, get a little more money, get a few more drugs, and that's how he lives.  The evidence is clear and uncontroverted which means it's uncontradicted from that witness chair.  It shows that he dealt at least four or five occasions in illegally type of what we call controlled substances; that could be either illegal or legal drugs, legal drugs that you have to get through a prescription."

"Mr. Dartez said, 'Sure, come see me on the 27th.'  They met here at McDonald's in Bernalillo.  And you will remember, hopefully, that whole meeting.  Mr. Montano and the Defendant, they met.  And the Defendant, what's the first thing he does?  He starts bragging about, I can get you cocaine. I can get you kilos of cocaine, meaning pounds of cocaine."