2001–NMCA–102

35 P.3d 993

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Myrvin NYSUS, Defendant–Appellant.**

**No. 20,185.**

Court of Appeals of New Mexico.

Sept. 24, 2001.

Certiorari Denied, No. 27,173,
Nov. 19, 2001.

Patricia A. Madrid, Attorney General, M. Victoria Wilson, Assistant Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Carolyn R. Glick, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

ARMIJO, Judge.

{1} Myrvin Nysus (Defendant) appeals his conviction for aggravated stalking. Defendant asserts on appeal that his Motion to Dismiss and/or Suppress Evidence Due to Illegal Arrest should have been granted because (1) the University of New Mexico (UNM) campus police officer who arrested him did not have jurisdiction to arrest him; (2) the inventory search was invalid as to the items that were seized, but not inventoried in the vehicle tow report; and (3) admission of the illegally-seized evidence was not harmless error. Defendant also claims ineffective assistance of counsel. We affirm the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} Defendant was convicted of aggravated stalking of his ex-wife, Jennifer Nysus (Victim). Defendant and Victim were divorced in February 1995 from a troubled marriage of twenty-three years. After the divorce, Victim obtained a series of temporary restraining orders (TRO) against Defendant. The record includes restraining orders issued in 1994, 1996, and 1997. The most recent TRO was in effect from October 21, 1997 to October 21, 1998, during which time the alleged aggravated stalking occurred. This order instructed Defendant not to abuse Victim, including harassing, restraining, assaulting, swearing at, threatening, destroying property, throwing things at, following, making harassing telephone calls, causing physical injury to, battering in any manner, or stalking. It further provided that he must not come within 100 yards of where she works or lives. Victim testified that she did not want to put her home or work address on the order because she was afraid that Defendant would carry out the threats he made on her life.

{3} Victim's daughter, Mercedes (Daughter), also had a restraining order issued against Defendant, her father, in 1997. She testified that she was afraid of Defendant and sought a restraining order because "he would follow my mom and me wherever we went." She testified that Defendant had a bad temper and that she was afraid for Victim's safety.

{4} Victim testified that Defendant followed her on two occasions in early 1998. On March 30, 1998, Victim observed Defendant following her in a Volvo as she drove through the streets of Albuquerque. He followed her as she drove to a McDonald's drive-thru window and continued after she left McDonald's until she was able to locate a police officer. After this incident, Victim became fearful that Defendant would find her and hurt her.

{5} On April 2, 1998, Victim left work early and took a different route home in an attempt to avoid another encounter with Defendant. While driving southbound on Carlisle Boulevard, she saw Defendant drive past her in the same Volvo, heading north. In her rearview mirror, she observed him turn around in the middle of the road and begin to follow her again. She proceeded to drive to a police substation located near Girard Boulevard and Central Avenue. When an officer came out to look for Defendant, he was gone. After both of these incidents, Victim filed reports with the police.

{6} The following day, on April 3, 1998, Victim and Daughter, who worked in the same building, went out to the parking lot after work and found a piece of paper under-

neath a windshield wiper of Victim's car. The paper was a copy of an advertisement from the March 15, 1998 edition of the *Albuquerque Journal* that stated, "Anyone knowing the whereabouts in [Albuquerque] of Monique, Mikhail, Mercedes & Jennifer Nysus, please call ... 892–8997." The ad was highlighted in pink and a message was written on the side of the ad, "Thanks to Hagars [sic]." Victim was terrified that Defendant had located her and that "Thanks to Hagars" was his way of telling her that he learned of her whereabouts from her friends, Carol and Yaqui Haagar. The telephone number in the ad was the number for the address where Defendant lived. Monique, Mikhail, and Mercedes are Defendant's and Victim's three children. Victim called the district attorney's office and the University of New Mexico Police Department immediately after finding the ad on her windshield.

{7} At the time of the stalking incidents, Victim worked for the University of New Mexico, Center for Development and Disabilities. Her office was located at 2300 Menaul Boulevard and was off campus, but on UNM property. Detective Merges, a UNM police officer, responded to her call regarding the April 3 incident. At the time he responded to the call, he had previously investigated incidents and was aware of the restraining orders issued against Defendant. He had previously been contacted by the district attorney's office and had also been involved in assuring Daughter's safety while she was on campus. On April 3, the detective was concerned for the women's safety and took them to a "safe house." The following day, he went to Defendant's home and observed Defendant driving a maroon or brown Volvo matching the description of the car given by Victim.

## I. *The Arrest and Search*

{8} Another stalking incident, which led to the filing of charges against Defendant, occurred on April 7, 1998. On that afternoon, Detective Merges was patrolling in an unmarked police car in the parking lot outside Victim's workplace. He testified that he was surveilling the parking lot when he saw what looked like Defendant's car drive into the parking lot. He further testified that he approached the car and observed that Defendant was driving. He called dispatch and requested backup. He then proceeded to follow Defendant out of the parking lot and onto Menaul Boulevard. He followed Defendant westbound on Menaul and then north on Broadway Avenue. Defendant turned east onto Candelaria Road. According to Detective Merges, Defendant stopped at the intersection of Candelaria and the entrance to Interstate 25 and made a left-hand turn onto the highway. The detective followed Defendant as he drove northbound on Interstate 25, west on Tramway Boulevard, north on Highway 313, into the Town of Bernalillo, west on Calle de Bosque, and finally north on Avenida San Ysidro in Bernalillo. During the chase, Detective Merges and Defendant drove through Sandia Pueblo and through Bernalillo. Throughout this time, Detective Merges was in contact with dispatch concerning his whereabouts.

{9} Once in Bernalillo, the vehicles approached an intersection where a school bus was stopped. Defendant stopped. Detective Merges pulled over to the right-hand side of Defendant's car. Officer Bello, a UNM police officer who responded to the dispatch call for backup, and Officer Armijo of the Sandia Pueblo Police Department, stopped behind Defendant. Officer Bello was in uniform and in a marked police car. At some point, two officers from the Bernalillo Police Department arrived.

{10} Officer Armijo ordered Defendant to shut off the engine and get out of the car. Defendant initially refused to get out of the car. The officers pulled him out of the vehicle. Officer Bello handcuffed Defendant, put him in the back of his police car, and read him his *Miranda* rights.

{11} Chief Camponozzi of the Sandia Pueblo Police Department handed Detective Merges three pieces of paper that allegedly fell out of Defendant's pockets while being arrested. One piece of paper was a Bank of America Versateller receipt and the other two were two halves of a ripped postcard.

## II. *The Inventory Search*

{12} An inventory search was conducted of Defendant's car. Officer Bello filled out a standard "Tow–in–Report" form before having Defendant's car towed. He listed the following items under "Inventory of Vehicle" on the form: "1 Swiss Gear Pocket Knife[,] 1 set of Cuff Links [and] Tie Tack (inexpensive)[,] 1 Hand Held Light[,] 1 Electric Razor." These items were found in the main compartment of the car. In addition to the items listed on the tow sheet, the officers found a copy of the ad asking for the whereabouts of Victim attached to the driver's side visor and a gray fanny pack.

{13} The trunk of Defendant's car was opened, either by using Defendant's keys or the trunk lever inside the car. The officers noticed a briefcase inside the trunk. Defendant and Detective Merges testified that the briefcase was closed with the combination set in the open position. Detective Merges looked inside the briefcase during the inventory search. Among the papers found in the briefcase was a copy of the ad asking for Victim's whereabouts and a pink highlighter.

{14} The items discovered during the inventory search were left in the trunk of the car with the exception of the ad found on the driver's seat visor and the gray fanny pack, which were taken into police custody. After securing a search warrant for Defendant's car and briefcase, Detective Merges searched the car at the tow company premises. During this search, he found store receipts and a bank Versateller machine receipt. These items were placed in police custody.

## III. *Motion to Dismiss Based on Jurisdictional Grounds*

{15} Defense counsel moved to dismiss on the ground that Officer Bello lacked jurisdiction to arrest Defendant. Defendant argued that the officer lacked jurisdiction because the arrest took place outside of university property. The State responded that Detective Merges had authority to arrest Defendant under the fresh pursuit doctrine because Defendant was observed by university police personnel to have committed a felony on university property. The felony was identified as aggravated stalking—a fourth-degree felony. The State further argued that even though Detective Merges did not himself arrest Defendant, the arrest was legal under a "team concept" approach. Officer Bello, the State argued, was on the scene in response to the backup request made by Detective Merges. The trial court denied the motion to dismiss.

## IV. *Motion to Suppress*

{16} Defense counsel also moved to suppress evidence seized as a result of the arrest upon two grounds: (1) the items seized after the illegal search were fruit of a poisonous tree and (2) the search of the briefcase was beyond the scope of an inventory search and therefore constituted an illegal warrantless search. The State responded that the officer properly searched the unlocked briefcase as part of an inventory search designed to protect his agency from liability from a claim of lost or stolen property. The trial court denied the motion to suppress.

## DISCUSSION

### I. *Jurisdiction of Arresting Officers*

{17} Defendant claims that, because there was no jurisdiction for the arrest, all evidence seized as a result of the arrest should have been suppressed. He argues that Officer Bello, as a UNM police officer, did not have jurisdiction to arrest Defendant in Bernalillo. He further argues that Detective Merges had no authority to stop and arrest Defendant because he was not in uniform. Defendant also claims that even if Detective Merges did have authority to arrest Defendant, he could not confer such authority to Officer Bello to make an arrest outside UNM's jurisdiction.

{18} We will not disturb a trial court's denial of a motion to suppress on appeal if it is supported by substantial evidence unless it appears that the determination was incorrectly premised. *State v. Jacobs*, 2000–NMSC–026, ¶ 34, 129 N.M. 448, 10 P.3d 127 (citing *State v. Boeglin*, 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983)). On appeal, we look to whether the law was correctly applied to the facts and review the

evidence in the light most favorable to support the decision reached below, resolving all conflicts and indulging all inferences in support of that decision. *Id.* The interpretation of a statute is a matter of law which we review de novo. *State .v. Dawson,* 1999–NMCA–072, ¶ 8, 127 N.M. 472, 983 P.2d 421.

{19} The jurisdiction of UNM police officers is limited to "within the exterior boundaries of lands under control of the board of regents employing them, including public streets and highways within such boundaries." NMSA 1978, § 29–5–2(B) (1975). It is undisputed that the arrest was made outside the limits imposed by statute. The State contends, however, that the UNM officer who arrested Defendant had jurisdiction to arrest Defendant under the common law rule of "fresh pursuit," even though the arrest did not take place on "lands controlled by the board of regents." *Id.* Our Supreme Court recognized the common law doctrine of fresh pursuit for warrantless arrests made outside of an officer's jurisdiction. *Benally v. Marcum,* 89 N.M. 463, 466, 553 P.2d 1270, 1273 (1976) (recognizing that "[t]he common law doctrine of fresh pursuit allows a peace officer to arrest beyond the boundaries of his jurisdiction only in pursuit of a person believed to have committed a felony."). New Mexico has also adopted the Uniform Act on Fresh Pursuit, which recognizes the fresh pursuit exception to the jurisdictional requirement for peace officers of other states pursuing a felon into New Mexico. NMSA 1978, § 31–2–1 (1937).

{20} The first question we address is whether the fresh pursuit doctrine applies to university police in New Mexico. We believe that it does. Our legislature has given university police officers the powers of peace officers to enforce the laws of the state within their jurisdictions. Section 29–5–2(B).

{21} Section 29–5–2(B) states:

At all times while on duty, university police officers shall carry commissions of office issued by the board of regents. University police officers have the powers of peace officers within the exterior boundaries of lands under control of the board of regents employing them, including public streets and highways within such boundaries. Within this territory, a university police officer may enforce all applicable laws, ordinances and campus traffic regulations.

As Defendant correctly states, this statute limits the jurisdiction of the UNM police department to lands under control of the board of regents. *Dawson,* 1999–NMCA–072, ¶ 17, 127 N.M. 472, 983 P.2d 421 (holding that UNM officers possessed the powers of peace officers in dealing with the defendant as long as he was parked " 'within the exterior boundaries' " of the university) (quoting § 29–5–2(B)). However, that a police department has a limited jurisdiction does not mean that the fresh pursuit doctrine does not apply to that police department. For example, the New Mexico State Police, as well as the county and municipal police departments, all have limited jurisdictions established by statute or local ordinance. NMSA 1978, § 29–2–18(A) (1979) provides that the New Mexico State Police "shall be conservators of the peace within the state." These peace officers, however, can assume jurisdiction over a fleeing felon outside their designated jurisdiction under the common law fresh pursuit doctrine. *See Benally,* 89 N.M. at 466, 553 P.2d at 1273.

{22} We see no reason why the fresh pursuit doctrine should not apply to university police as well. Because the legislature confers upon UNM police the authority to enforce all state laws within their jurisdiction, including felonies such as aggravated stalking, we cannot assume that the legislature intends to give them less authority than other peace officers to enforce those laws. *Cf. Commonwealth v. Holderman,* 284 Pa.Super. 161, 425 A.2d 752, 756 (1981) ("In order for a campus police agency to adequately protect the campus and its residents and to act as an effective adjunct to the local police force, its officers must be permitted to pursue and arrest persons who commit summary offenses on campus and attempt to escape into the adjoining municipality."). We conclude, therefore, that our legislature intended that university police have the same power to make warrantless arrests when in fresh pursuit of a felon as do other law enforcement personnel.

{23} We next address whether Officer Bello, the arresting officer, was in fresh pursuit of a person he believed to have committed a felony. We conclude that he was in such a pursuit.

{24} Prior to the date of Defendant's arrest, Detective Merges knew of Victim's history with Defendant and the previous incidents of stalking and harassment. He had been given copies of the various restraining orders issued against Defendant. The restraining orders prohibited Defendant from coming within 100 yards of Victim's place of work. They further prohibited Defendant from contacting Victim in any way. With this knowledge, Detective Merges had reason to believe that when Defendant drove into the parking lot of the building where Victim worked, Defendant was committing the crime of aggravated stalking—a fourth-degree felony. See NMSA 1978, § 30–3A–3.1(A)(1) (1997). This incident occurred in the parking lot of a building owned by UNM and was within the jurisdiction of the UNM police. Detective Merges, under the circumstances, had jurisdiction to pursue Defendant outside of his statutory jurisdiction and ultimately stop and effect his arrest under the common law fresh pursuit doctrine.

{25} Defendant contends that even if Detective Merges had jurisdiction to arrest Defendant in Bernalillo under the fresh pursuit doctrine, he could not have transferred this jurisdiction to Officer Bello, the officer who made the actual arrest. We note that Defendant does not argue that Officer Bello lacked probable cause to make the arrest. Instead, Defendant appears only to suggest that the fresh pursuit doctrine did not permit Officer Bello to join the pursuit after his assistance was requested by Detective Merges. Again, we look at the facts established at trial in the light most favorable to the State. Evidence was presented at trial that, upon recognizing Defendant in the parking lot at Victim's work place, Detective Merges contacted dispatch to request backup to assist him in stopping and arresting Defendant. The initial call to dispatch was made while Detective Merges was within his jurisdiction. He continually advised dispatch of his location while he pursued Defendant. Officer Bello remained in constant contact with dispatch and was advised over his radio of Detective Merges' location at all times during the pursuit. Thus, Officer Bello was involved in the pursuit of Defendant from the time the request for backup was made. Defendant points to no authority which would render the doctrine of fresh pursuit unavailable to an officer who joins a pursuit, but who does not commence it. We conclude that Officer Bello had jurisdiction to arrest Defendant outside of his statutory jurisdiction under the common law doctrine of fresh pursuit and that the arrest was legal.

## II. *Suppression of Evidence*

{26} Inventory searches are well established as an exception to the warrant requirement of the Fourth Amendment. *State v. Shaw*, 115 N.M. 174, 176, 848 P.2d 1101, 1103 (Ct.App.1993). In *State v. Ruffino*, 94 N.M. 500, 502, 612 P.2d 1311, 1313 (1980), our Supreme Court established three requirements for a lawful inventory search: (1) the search must be of a vehicle in police control or custody, (2) the search must be conducted pursuant to established police regulations or procedures, and (3) the search must be reasonable.

{27} In the present case, the basis for the police taking custody of the vehicle was Defendant's arrest. Defendant argues that if his arrest was illegal, police custody of the vehicle was not legally obtained. We have heretofore determined that the arrest of Defendant was legal.

{28} Defendant further asserts that the seizure of items not listed in the vehicle tow report was illegal. He argues that the State failed to prove that these items were seized according to established police regulations— the second requirement of a valid inventory search.

{29} When questioned about the standard practice of conducting an inventory search, Officer Bello testified:

When you tow a vehicle[,] just to make sure that nothing is stolen from the vehicle[,][w]e do what is known as an inventory search because it has come back where someone has said that this was in the

vehicle, and then it comes to question as to whether or not it actually was. So what we do is we take anything of value from the vehicle. . . . [W]e will take anything that we believe is of value, and we will note it on the inventory sheet, and then normally I will lock it in the trunk . . . so that is my normal procedure for doing an inventory search. You open the trunk, make sure there is nothing in there.

The inventory search conducted in this case did not deviate from the procedure testified to by Officer Bello. The officers were lawfully entitled to search the entire vehicle, including the trunk. Officer Bello listed the items on the tow sheet that he thought were of value: a swiss army pocket knife, a set of cuff links, a tie tack, a hand-held light, and an electric razor. He did not testify that it was standard procedure to list every single item found in the car.

{30} Defendant does not cite any authority for the proposition that only the items listed in the vehicle tow report are admissible into evidence. He does not cite to evidence in the record below that the inventory procedures utilized by Officer Bello and Detective Merges deviated from the standard procedure. When an appellant cites no authority to support a specific proposition, the appellate court presumes that no supporting authority exists. *In re Doe,* 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). Further, we note that the items at issue were not seized during the inventory search, but were seized pursuant to a search warrant obtained by Detective Merges after the car had been towed.

{31} The ad and the fanny pack were seized prior to the issuance of the search warrant. A search warrant should normally be obtained prior to seizing evidence of a crime found during an inventory search. *Ruffino,* 94 N.M. at 502, 612 P.2d at 1313. However, the seizure of these items does not require reversal for two reasons. Defendant did not argue below or on appeal that a warrant should have been obtained for these items. Therefore, Defendant failed to preserve this issue for review. *See State v. Varela,* 1999–NMSC–045, ¶ 25, 128 N.M. 454, 993 P.2d 1280 (stating that to preserve an error for appeal, an objection below must be made with sufficient specificity to alert the trial court to the error). Notwithstanding this lack of preservation, Defendant has not demonstrated on appeal how the outcome of the trial was prejudiced by its admission, or that it made Defendant's guilt any less certain. *Jacobs,* 2000–NMSC–026, ¶ 58, 129 N.M. 448, 10 P.3d 127.

{32} Finally, we review whether the inventory search was reasonable. An inventory search is generally found to be reasonable if it is made pursuant to established procedures and it furthers any of the three following purposes: "(1) to protect the arrestee's property while it remains in police custody; (2) to protect the police against claims or disputes over lost or stolen property; or (3) to protect the police from potential danger." *Shaw,* 115 N.M. at 177, 848 P.2d at 1104; *see also State v. Romero,* 2001–NMCA–046, ¶ 15, 130 N.M. 579, 28 P.3d 1120; *State v. Johnson,* 1996–NMCA–117, ¶ 15, 122 N.M. 713, 930 P.2d 1165. Inventory searches, like all warrantless searches, are presumed to be unreasonable. *Shaw,* 115 N.M. at 176, 848 P.2d at 1103. The burden of establishing their validity rests upon the State. *Romero,* 2001–NMCA–046, ¶ 15, 130 N.M. 579, 28 P.3d 1120; *Shaw,* 115 N.M. at 176, 848 P.2d at 1103. Defendant argues that the inventory search was unreasonable as to the items not listed on the vehicle tow report. Specifically, he argues that Officer Bello's testimony established that seizure of non-valuable items did not serve these purposes. Again, Defendant cites no authority. Yet, he argues that the court's error in admitting the seized evidence was not harmless error. Because we find that the evidence was properly admitted, we do not address this claim.

### III. *Ineffective Assistance of Counsel*

{33} Daughter testified that Defendant had stalked her and that she was afraid of him. Defendant argues that this testimony was inadmissible under Rules 11–404(B) and 11–403 NMRA 2001 to prove that Defendant stalked Victim, and that defense counsel's failure to object to it was ineffective assistance of counsel.

{34} Counsel is ineffective when (1) performance falls below the standard of a reasonably competent attorney and (2) the deficient performance prejudices the defendant. Prejudice occurs if there is a reasonable probability that, but for the attorney's errors, the result of the proceeding would have been different. *State v. Brazeal*, 109 N.M. 752, 757–58, 790 P.2d 1033, 1038–39 (Ct.App.1990). A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.*

{35} While this Court has held that an attorney's failure to object to testimony concerning prior bad acts was ineffective assistance of counsel, *State v. Dartez*, 1998–NMCA–009, ¶ 34, 124 N.M. 455, 952 P.2d 450, Defendant's claim here fails for two reasons. First, defense counsel before trial objected to all testimony concerning prior bad acts. Defense counsel made a motion in limine to exclude testimony regarding Defendant's prior conviction, testimony regarding incidents involving people other than Victim, and testimony regarding prior restraining orders, including the restraining orders pertaining to Daughter. Later in the trial, counsel acknowledged that the motion in limine was an objection to the admission of the restraining orders. Second, defense counsel's cross-examination of Daughter suggests the strategic decision not to place emphasis on Daughter's testimony by objecting to it in front of the jury. "A prima facie case [of ineffective assistance of counsel] is not made if there is a plausible, rational strategy or tactic to explain counsel's conduct." *Id.* ¶ 26. For example, on direct examination, Daughter testified that she was afraid of Defendant. Defense counsel on cross-examination then attempted to impeach Daughter by asking her if it was not true that Defendant never hit her, implying that she had no reason to fear Defendant. Thus, it appears plausible that defense counsel made a strategic decision not to object to Daughter's testimony.

{36} Further, prior to trial, the court determined that the restraining orders, as well as incidents with other people, were admissible because they "demonstrate a course of conduct, which is necessary to prove stalking." Thus, the trial court determined that Daughter's restraining order and testimony concerning the restraining order could be relevant to Defendant's stalking of Victim. Daughter testified that she lived with Victim and that she was afraid that if Defendant found her, he would find Victim as well. Defense counsel could have reasonably concluded that any further objection would not have resulted in a different outcome. We reject Defendant's claim of ineffective assistance of counsel.

## CONCLUSION

{37} Defendant's conviction for aggravated stalking is affirmed.

{38} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Judge, and JONATHAN B. SUTIN, Judge.