# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 29, 2016

**NO. 34,261**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellant,

v.

**TAYLOR E.,**

     Child-Appellee.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Marci E. Beyer, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellant

Bennett J. Baur, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellee

**OPINION**

**VANZI, Judge.**

{1}     Taylor E. (Child), a juvenile on probation, made incriminating statements to his probation officer that jeopardized his probationary status. In response to a subsequent petition to revoke his probation, Child moved to suppress those statements, contending that they were inadmissible because the State proffered no independent evidence of the admitted conduct and no evidence that the probation officer had advised Child of his rights under the Delinquency Act (the Act), NMSA 1978, §§ 32A-2-1 to -33 (1993, as amended through 2016), of the New Mexico Children's Code. The State challenges the district court's ruling that Child's incriminating statements must be suppressed. We reverse.

**BACKGROUND**

{2}     In 2011, when Child was almost fourteen years old, the State filed a delinquency petition alleging that he had committed a battery against a household member. Child pleaded no contest and, pursuant to a consent decree, was placed on supervised probation for six months subject to certain terms and conditions, with an automatic six-month extension. Less than a year after Child signed the agreement stating the terms and conditions of probation, the State filed a petition to revoke Child's probation, alleging that Child had violated specific conditions of the

probation agreement; i.e., by drug trafficking, possession of drugs and drug paraphernalia, running away, and being unsuccessfully discharged from treatment foster care. Child pleaded no contest, and the district court entered an order revoking Child's probation. The order committed Child to the Children, Youth and Families Department (CYFD) for two years, but ordered that the commitment be suspended and that, pursuant to Section 32A-2-19(B)(2), Child be placed on probation subject to terms and conditions for a period not to exceed two years.

{3} The terms and conditions of probation were memorialized in a probation agreement (the Agreement) signed by Child and his juvenile probation officer (JPO), among others. The Agreement listed twenty conditions, including that Child would attend school with no un-excused absences; that he would not use or possess alcohol, drugs, drug paraphernalia, or weapons; and that he would not commit any act forbidden by law. The Agreement also provided that Child's JPO could periodically visit Child's home, school, or work site, and could search Child's person and property if the JPO deemed it necessary.

{4} A month before his probation period was to expire, Child violated several conditions of the Agreement. Based on a report by Child's JPO, the State filed a petition to revoke probation, alleging that Child had twice failed to attend school "with no un-excused absences"; that he was "issued a Class III for Battery after he

was involved in a physical confrontation with another student"; that he was in possession of a pipe in his pocket; and that he admitted to his JPO that he had smoked "spice" (a synthetic cannabinoid) that morning and had been smoking spice on a daily basis. The revocation petition contained no allegation that Child had committed a "delinquent act," nor does the record reveal that Child had been arrested for any of the conduct alleged in the revocation petition, or that a delinquency petition was filed alleging that Child had committed a delinquent act based on the conduct alleged in the revocation petition.

{5} Prior to the probation revocation hearing, Child filed a motion to suppress his admissions to the JPO that he had smoked spice, arguing that they were inadmissible under Section 32A-2-14(G) of the Act because the State failed to provide corroborating evidence of Child's spice use and because the JPO failed to give *Miranda* warnings and/or recitations required by Section 32A-2-14(D) before questioning him about his possession and use of spice.

{6} Child's JPO, Roscio Sarmiento, the sole witness at the suppression hearing, testified that Child's "mother" called her and reported that Child had been suspended from school because an officer had seen him in possession of a pipe. In response, Ms. Sarmiento set up a meeting with Child for the following day, which she described as "almost like a routine meeting. Anytime there's an incident with one of the [children,

I] try to call them in as soon as possible." As she generally does in such situations, Sarmiento met with Child at her office.

{7} At the meeting, Sarmiento asked Child the same types of routine questions she asks her clients following an incident that might affect their probationary status. For example, she asks about the issue or incident, how they are doing in school, what led up to the incident, whether they are having problems at home, whether they are "clean," and whether they are using drugs. In addition to these questions, Sarmiento asked Child about the pipe and drug use. Although he initially said he was clean, Child later admitted that he had used drugs. Sarmiento testified that she did not give Child any *Miranda* warnings before questioning him about his drug use; that she would have done so only if a new charge would be filed; and that she did not believe that there would be a new charge against Child in this instance.

{8} The district court granted Child's motion to suppress. The order contains no factual findings and states only that "[a]ny of [Child's] statements made to [Sarmiento] on September 17, 2014 related to this cause are hereby suppressed

pursuant to Section 32A-2-14(G) . . . ,[1] Section 32A-2-14(C)[, and] Section 32A-2-14(D)." This appeal followed.

**STANDARD OF REVIEW**

{9}     "A motion to suppress evidence involves a mixed question of fact and law." *State v. Vandenberg*, 2003-NMSC-030, ¶ 17, 134 N.M. 566, 81 P.3d 19. "Thus, our review . . . involves two parts: the first is a factual question, which we review for substantial evidence; the second is a legal question, which we review de novo." *Id.* As noted, the district court made no written findings of fact to support its decision to suppress Child's incriminatory statements to his JPO. In such circumstances, we generally draw all inferences and indulge all presumptions in favor of the district court's ruling in conducting our de novo assessment of whether the court correctly applied the law. *See State v. Nysus*, 2001-NMCA-102, ¶ 18, 131 N.M. 338, 35 P.3d 993 ("On appeal, we look to whether the law was correctly applied to the facts and review the evidence in the light most favorable to support the decision reached below, resolving all conflicts and indulging all inferences in support of that decision."). The relevant facts are undisputed.

---

[1]Section 32A-2-14(G) provides, "An extrajudicial admission or confession made by the child out of court is insufficient to support a finding that the child committed the delinquent acts alleged in the petition unless it is corroborated by other evidence." Child concedes that this provision "is not a basis for suppressing a statement." Accordingly, we do not address the point.

{10} The question whether *Miranda* applies in these circumstances requires application of law to the facts and is reviewed de novo. *See State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (applying de novo review of question whether there was a custodial interrogation requiring *Miranda* warnings). We also review de novo the question whether the district court correctly applied the Act. *See State v. Antonio T.*, 2015-NMSC-019, ¶ 12, 352 P.3d 1172 (stating that statutory interpretation is a question of law that is reviewed de novo).

**DISCUSSION**

{11} The question presented is whether the failure of Child's JPO to give "*Miranda*" warnings before questioning Child after she learned of his suspension from school because an officer had seen him in possession of a pipe rendered Child's inculpatory statements to the JPO inadmissible in Child's probation revocation proceedings.[2] Below, Child relied not only on the Act but also on law addressing the rights of adult probationers under the federal constitutional Miranda rule. Here, both parties rely on authority addressing constitutional protections against self-incrimination available to juveniles and adult probationers, as well as certain requirements for the application

---

[2]Child makes no argument that the New Mexico Constitution provides broader protection than the United States Constitution in these circumstances. We therefore assume without deciding that both afford equal protection in this context. *See State v. Gomez*, 1997-NMSC-006, ¶ 22, 122 N.M. 777, 932 P.2d 1.

6

of the constitutional Miranda rule. The parties are less than precise in distinguishing between the constitutional Miranda rule and the "Miranda" protections available under the Act, but the Act itself references the "constitutional rights" of juveniles (*see* Sections 32A-2-14C, D), and Child relies on those provisions on appeal. In addition, New Mexico courts have considered constitutional Miranda jurisprudence in determining the scope of protections against self-incrimination available to adult probationers and to juveniles subject to the Act. And the issue in this case arises because our Supreme Court has not definitively delineated the scope of the protection against self-incrimination available to juveniles in this context. For these reasons, and because the rule Child advocates, if accepted, would have profound consequences for the administration of New Mexico's juvenile justice system, we consider in some detail the constitutional Miranda rule, the relevant provisions of the Act, and the aims and operation of the juvenile probation system.

**A.    The Federal *Miranda* Rule Does Not Bar Admission of Child's Incriminating Statements in a Probation Revocation Proceeding**

{12}    *Miranda v. Arizona*, 384 U.S. 436 (1966), established the federal constitutional rule that incriminatory statements made by a criminal suspect during "custodial interrogation" by law enforcement may not be admitted into evidence in a criminal proceeding unless the prosecution demonstrates that sufficient procedural safeguards

7

were employed to protect the suspect's Fifth Amendment privilege against self-incrimination. *Id.* at 444. The rule is summarized as follows:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Id.* (footnote omitted).

{13} *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* It is settled that a suspect is not "in custody" and *Miranda*'s requirements do not apply unless "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks and citation omitted); *see Nieto*, 2000-NMSC-031, ¶¶ 20-21 (stating these requirements and that "[c]ustody is determined objectively, not from the subjective perception of any of the members to the interview" and holding that *Miranda* warnings were not required where facts showed routine, non-custodial police questioning).

8

{14}    *Minnesota v. Murphy*, 465 U.S. 420 (1984), established that *Miranda*'s requirements do not apply to a probationer's statements made during an interview with his probation officer, reasoning, inter alia, that the defendant "was not 'in custody' for purposes of receiving *Miranda* protection since there was no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Murphy*, 465 U.S. at 429-31 (internal quotation marks and citations omitted). Emphasizing that the defendant was not under arrest when he made incriminating statements to his probation officer and was free to leave after the meeting, the Court said that "[a] different question would be presented if [the defendant] had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting." *Id.* at 429 n.5. The Court also recognized that some questions put to a probationer could be relevant to probationary status but "pose[] no realistic threat of incrimination in a separate criminal proceeding" and that "a state may validly insist on answers to even incriminating questions, and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." *Id.* at 435 n.7. Federal law thus recognizes that some incriminating statements that are admissible in probation revocation proceedings may be

inadmissible in proceedings to adjudicate criminal liability on a charge for which the probationer has been prosecuted.

{15} This distinction is important and warrants emphasis: In a criminal prosecution, the defendant has been charged with having engaged in criminal conduct, and the purpose of the proceeding is to determine the defendant's criminal liability. In contrast, the respondent in a probation revocation proceeding is an individual who has already been adjudicated liable for criminal conduct, has been placed on probation as a result of that conduct and as an alternative to imprisonment, and is subsequently alleged to have violated one or more court-imposed (and usually agreed-upon) conditions of that probation. Our Supreme Court has recognized that a determination to revoke probation constitutes an adjustment of a previously imposed sentence, rather than an adjudication of criminal liability. *See State v. Lopez*, 2007-NMSC-011, ¶ 12, 141 N.M. 293, 154 P.3d 668 ("By failing to comply with probation conditions, a defendant demonstrates that clemency is not appropriate because he or she is not willing or able to be rehabilitated. It follows that the court must have broad power to adjust a defendant's sentence by revoking probation when necessary.").

{16} Consistent with this distinction between proceedings involving an already convicted individual and one being prosecuted to determine criminal liability on a new charge, the United States Supreme Court has held that, while loss of liberty may

10

result in both types of proceedings, fewer protections are warranted for the former category of proceedings. *See Morrissey v. Brewer*, 408 U.S. 471, 480, 484-90 (1972) (explaining that "the revocation of parole is not part of a criminal prosecution, and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations" and that "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions"; holding that this loss of liberty requires that the parolee be accorded certain due process protections, but not the full panoply of constitutional protections available in a criminal trial); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (explaining that "[p]robation revocation, like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of liberty"; holding that probationers are entitled to the same due process protections as *Morrissey* specified for parolees). The due process protections specified in *Morrissey* do not include *Miranda*'s requirements. *See Morrissey*, 408 U.S. at 484-90; *State v. Gutierrez*, 1995-NMCA-018, ¶ 3, 119 N.M. 618, 894 P.2d 395.

{17} The United States Supreme Court has also held that, in the context of a "proceeding to determine whether a minor is a 'delinquent' and which may result in commitment to a state institution[,]" "the constitutional privilege against self-

incrimination is applicable in the case of juveniles as it is with respect to adults." *In re Gault*, 387 U.S. 1, 44, 55 (1967). The Court "has not yet held that *Miranda* applies with full force to exclude evidence obtained in violation of its proscriptions from consideration in juvenile proceedings," although it has made that assumption without deciding the issue. *Fare v. Michael C.*, 442 U.S. 707, 717 n.4 (1979). The Court has, however, described *Gault* as treating a juvenile "delinquency" proceeding as "functionally akin to a criminal trial" and stated that "[a] juvenile charged with violation of a generally applicable statute is differently situated from an already-convicted probationer or parolee, and is entitled to a higher degree of protection." *Gagnon*, 411 U.S. at 789 n.12. *Gault* itself also emphasized that "what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage has no necessary applicability to other steps of the juvenile process." 387 U.S. at 31 n.48.

{18} The Court has warned that *Miranda*'s requirements may not be extended in a manner that "would cut [*Miranda*'s] holding . . . completely loose from its own explicitly stated rationale" and "impose the burdens associated with the rule of *Miranda* on the juvenile justice system and the police without serving the interests that rule was designed simultaneously to protect." *Fare*, 442 U.S. at 723 (internal quotation marks and citation omitted).

{19} Applying the foregoing principles to the record before us, we see no basis to hold, as a matter of federal constitutional law, that the failure of Child's JPO to give *Miranda* warnings to Child before questioning him about the information she received from Child's mother—that Child had been suspended from school for possessing a pipe—renders Child's incriminating statements to his JPO regarding his spice use inadmissible in a probation revocation proceeding.

{20} As an initial matter, we note that the United States Supreme Court has not extended *Miranda*'s requirements "beyond the scope of the holding in the *Miranda* case itself[,]" and observe the constraint that "a [s]tate may not impose greater restrictions as a matter of *federal constitutional law* when [the United States Supreme] Court specifically refrains from imposing them." *Fare*, 442 U.S. at 717 (alteration, internal quotation marks, and citation omitted). Consistent with these principles, we have not extended *Miranda*'s requirements, as a matter of federal law, beyond the boundaries set by the United States Supreme Court.

{21} For example, this Court has previously recognized that *Miranda* warnings are "required to dissipate the overbearing compulsion caused by isolation of a suspect in police custody" and that "custodial interrogation and probation interviews are readily distinguishable for purposes of Fifth Amendment analysis." *Gutierrez*, 1995-NMCA-018, ¶¶ 12, 13 (alterations, internal quotation marks, and citation omitted). In

13

*Gutierrez*, we quoted as follows *Murphy*'s rationale for rejecting the probationer's argument in that case that *Miranda* applied to bar admission of the incriminatory statements he made to his probation officer:

> Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. It is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to a similar impression. Moreover, custodial arrest thrusts an individual into an unfamiliar atmosphere or an interrogation environment created for no purpose other than to subjugate the individual to the will of his examiner. Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment. The coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. Since [the defendant] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.

*Gutierrez*, 1995-NMCA-018, ¶ 13 (alterations omitted) (quoting *Murphy*, 465 U.S. at 433); *see Murphy*, 465 U.S. at 433 ("[The defendant's] regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the privilege.").

{22} In *State v. Hermosillo*, 2014-NMCA-102, ¶¶ 12-13, 336 P.3d 446, we explained that "probation is an act of clemency with the goal of education and

14

rehabilitation" and that "[a]lthough a probationer does not lose the privilege against self-incrimination, the United States Supreme Court has refused to extend the requirements of *Miranda* warnings to prearranged routine probation interviews with probation officers." *Hermosillo* involved a probationer's incriminating statements made during a home visit by a probation officer, who was accompanied by a law enforcement officer, pursuant to an agreed-upon probation condition requiring the defendant to promptly answer the door, invite the visiting officers inside, and cooperate with them. *Id.* ¶¶ 4-5. The probation officer had not originally planned to visit the defendant but decided to do so because the defendant "had recently been testing positive for drugs." *Id.* ¶ 5. Noting that "*Murphy* informs us that a routine visit of a probationer by his probation officer . . . does not ordinarily present a Fifth Amendment situation that will be recognized as an in-custody interrogation[,]" *Hermosillo*, 2014-NMCA-102, ¶ 19, we explained, inter alia, that unscheduled home visits were specifically authorized by court order and agreement and that, having previously tested positive for drugs at office visits, the defendant "could reasonably expect that his probation officer might conduct a home visit to investigate these violations." *Id.* ¶ 26. "At the outset," we said, "the probation officer knew [the d]efendant had recently tested positive for drugs at prior office visits, and the home visit was specifically undertaken to investigate these prior violations." *Id.* ¶ 31. Thus,

we held that *Miranda*'s requirements did not apply, notwithstanding the presence of law enforcement and that the defendant was placed in handcuffs during the encounter. *Hermosillo*, 2014-NMCA-102, ¶¶ 28-33; *see State v. Ponce*, 2004-NMCA-137, ¶¶ 37-38, 136 N.M. 614, 103 P.3d 54 (stating that, although the issue was not preserved, *Miranda* warnings were not required where probationer was not arrested "for independent criminal activity, but for breach of the no-alcohol condition of his probation which would result, at worst, in a revocation of [the d]efendant's probation, not in new criminal charges" and the defendant was not questioned "in a setting that could be characterized as unfamiliar or an interrogation environment").

{23} On this record, none of the factors triggering *Miranda*'s protections are implicated, nor does Child argue to the contrary. The facts establish that Child was no stranger to the juvenile probation system, having previously been placed on probation and having that probation revoked. The meeting at which Child made the incriminating statements occurred at a place familiar to him—his JPO's office—and was "almost like a routine meeting" at which the JPO asked Child the same types of routine questions she asks her clients following an incident that might affect their probationary status. While that meeting took place at the JPO's request, such meetings are specifically authorized under the Agreement, and Child should have expected that meetings with his JPO would occur in the ordinary course of his

16

probation, including meetings to discuss reports of conduct that might impact Child's probationary status.

{24}    In addition, the meeting took place because Child's mother had informed the JPO that Child had been suspended from school for possession of a pipe. Child had previously violated his probation by being in possession of drugs and drug paraphernalia, among other things. For this reason alone, Child could reasonably expect that his JPO might ask him about drug possession and use. There is no evidence that the meeting involved police presence, isolation, or confinement, let alone custodial interrogation initiated by law enforcement tantamount to a formal arrest or of coercion by the JPO when she questioned Child about his conduct. The JPO's questions were asked in furtherance of her role as Child's probation officer. No warnings were required by the federal *Miranda* rule.

**B.    The Act Provides Greater Protections Than Does the Federal *Miranda* Rule But It Does Not Require JPOs to Give Statutory Warnings in the Circumstances Presented Here**

{25}    As best we understand it, Child's statutory argument is as follows: (1) whenever a JPO "suspects" that a juvenile probationer has committed an act that might constitute a new delinquent act as well as a basis for probation revocation, the JPO may not question the juvenile about that act without first advising the juvenile of his/her constitutional rights and obtaining a knowing, intelligent, and voluntary

waiver of those rights; (2) a JPO's failure to give those warnings renders inadmissible in a probation revocation hearing any inculpatory statements made by the juvenile to the JPO. While it is clear that the Act does provide many greater protections than those afforded to adults, including greater protections than those afforded by the federal *Miranda* rule, the Act and the related regulations and rules also reflect distinctions between delinquency proceedings and probation revocation proceedings, and between law enforcement officers and JPOs that bear significantly on the proper interpretation of the Act's requirements in this context. Before addressing the Act's text, we outline the standards guiding and informing our interpretation of its requirements.

**1.      Principles of Statutory Construction**

{**26**}      "Statutory interpretation is an issue of law, which we review de novo." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064. "The text of a statute or rule is the primary, essential source of its meaning." NMSA 1978, § 12-2A-19 (1997). "When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Rivera*, 2004-NMSC-001, ¶ 10, 134 N.M. 768, 82 P.3d 939 (alteration, internal quotation marks, and citation omitted).

18

{27} However, the "beguiling simplicity" of the plain-meaning rule "may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Id.* ¶ 11 (internal quotation marks and citation omitted). "In such a case, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute." *Id.* (internal quotation marks and citation omitted). The literal meaning of a statute also does not control "when such an application would be absurd, unreasonable, or otherwise inappropriate." *Rivera*, 2004-NMSC-001, ¶ 13; *see Atchison, T. & S. F. Ry. Co. v. Town of Silver City*, 1936-NMSC-036, ¶ 13, 40 N.M. 305, 59 P.2d 351 ("Canons of construction are but aids in determining legislative intent and are not controlling if they lead to a conclusion, which by the terms or character of the legislation manifestly was not intended." (citation omitted)).

{28} Among other considerations, "we closely examine the overall structure of the statute we are interpreting, as well as the particular statute's function within a comprehensive legislative scheme[.]" *Rivera*, 2004-NMSC-001, ¶ 13 (citation omitted). "[W]henever possible we must read different legislative enactments as harmonious instead of as contradicting one another." *Id.* (alteration, internal quotation marks, and citation omitted). And we must construe a statute "so that no part of the

statute is rendered surplusage or superfluous." *State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1 (internal quotation marks and citation omitted).

**2.      The Act, Regulations, and Rules**

{29}      The Act has several stated purposes, including the following:

>       A.      consistent with the protection of the public interest, to remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions to the extent of the child's age, education, mental and physical condition, background and all other relevant factors, and *to provide a program of supervision, care and rehabilitation*, including rehabilitative restitution by the child to the victims of the child's delinquent act to the extent that the child is reasonably able to do so;
>
>       B.      to provide effective deterrents to acts of juvenile delinquency, including an emphasis on community-based alternatives;
>
>       C.      to strengthen families and to successfully reintegrate children into homes and communities[.]

Section 32A-2-2 (emphasis added).

{30}      The Act defines "delinquent act" as "an act committed by a child that would be designated as a crime under the law if committed by an adult," Section 32A-2-3(A), and "delinquent child" as "a child who has committed a delinquent act[,]" Section 32A-2-3(B). Other terms are defined by regulations promulgated under the Act (among other statutes), including the following: "Adjudication" means "a judicial determination that a juvenile has committed a *delinquent act*." 8.14.2.7(B) NMAC

20

(emphasis added). "Adjudicatory hearing" means "children's court hearing to decide whether the evidence supports the allegations of a petition, i.e., whether a *delinquent act* has been committed." 8.14.2.7(C) NMAC (emphasis added). "Petition" means "a legal document in which the state formally alleges the client to be a delinquent . . . due to the commission of a *delinquent act(s)*, or of a family subject to FINS." 8.14.2.7(W) NMAC (emphasis added). "Juvenile probation" means "a court-ordered sanction and disposition which *places an adjudicated client under the supervision and care of a juvenile probation officer*." 8.14.2.7(T) NMAC (emphasis added). "Juvenile probation officer (JPO)" means "a department staff person who[] provides court-ordered and informal *supervision* for clients." 8.14.2.7(U) NMAC (emphasis added). "Probation" means "a court-ordered sanction and disposition that *places an adjudicated client under the*[] *supervision and care of a* [*JPO*]." 8.14.2.7(Z) NMAC (emphasis added). "Preliminary inquiry (PI)" refers to "a conference between the JPO, client, and parent or guardian to assess whether a referral to the [children's court attorney (CCA)] should be made to file a *delinquency petition*." 8.14.2.7(Y) NMAC (emphasis added).

{31} Section 32A-2-7(A) of the Act provides that "[c]omplaints *alleging delinquency* shall be referred to probation services, which shall conduct a *preliminary inquiry* to determine the best interests of the child and of the public with regard to any

21

action to be taken." (Emphasis added); *see* Rule 10-211(A) NMRA ("Prior to the filing of a *petition alleging delinquency*, probation services shall complete a *preliminary inquiry* in accordance with the Children's Code." (emphasis added)). Section 32A-2-7(B) states, in part, that "[a]t the commencement of the *preliminary inquiry*, the parties shall be advised of their basic rights pursuant to Section 32A-2-14" and that "[t]he child shall be informed of the child's right to remain silent." Section 32A-2-7(B) (emphasis added); *see* 8.14.2.9(B) NMAC (stating that "[a]t the *commencement of the preliminary inquiry*, the [JPO] shall advise the client, parent, guardian, or custodian of the client's basic rights" and enumerating those rights).

{32}     The Act's provisions concerning "basic rights" are described in Section 32A-2-14. Subsection A states, "A child subject to the provisions of the . . . Act is entitled to the same basic rights as an adult, *except as otherwise provided in the Children's Code, including rights provided by the . . . Act, except as otherwise provided in the Children's Code.*" Section 32A-2-14(A) (emphasis added). Section 32A-2-14 also provides,

> C.     No person subject to the provisions of the . . . Act *who is alleged or suspected of being a delinquent child* shall be interrogated or questioned without first advising the child of the child's *constitutional rights* and securing a knowing, intelligent and voluntary waiver.

> D.     Before any statement or confession may be introduced at a trial or hearing *when a child is alleged to be a delinquent child*, the state shall prove that the statement or confession offered in evidence was

22

> elicited only after a knowing, intelligent and voluntary waiver of the child's *constitutional rights* was obtained.

Section 32A-2-14(C), (D) (emphasis added).

{33}     Section 32A-2-14(E) lists factors to be considered in determining whether the child "knowingly, intelligently and voluntarily waived the child's rights[.]" Section 32A-2-14(F), although not applicable in the case before us, provides that "[n]otwithstanding any other provision to the contrary, no confessions, statements or admissions may be introduced against a child under the age of thirteen years on the allegations of the petition" and that "[t]here is a rebuttable presumption that any confessions, statements or admissions made by a child thirteen or fourteen years old to a person in a position of authority are inadmissible." Section 32A-2-14(G) states, "An extrajudicial admission or confession made by the child out of court is insufficient to support a finding that the child committed the delinquent acts alleged in the petition unless it is corroborated by other evidence." Section 32A-2-14(L) provides, "A person afforded rights under the . . . Act shall be advised of those rights at that person's first appearance before the court on a petition under that act."

{34}     Section 32A-2-5 of the Act specifically addresses juvenile probation and parole. Among other things, it provides that "the department" (CYFD) shall provide juvenile probation and parole services, *see* § 32A-2-5(A), and has "the power and duty to:"

23

(1) receive and examine complaints and allegations that a child is a delinquent child for the purpose of considering beginning a proceeding pursuant to the provisions of the . . . Act;

(2) make case referrals for services as appear appropriate or desirable;

. . . .

(4) supervise and assist a child placed on probation or supervised release or under supervision by court order or by the department[.]

Section 32A-2-5(B); *see* 8.14.2.16 NMAC (stating tasks performed concerning probation and supervised release). This section specifies that "[a] juvenile probation and parole officer does *not* have the powers of a law enforcement officer." Section 32A-2-5(C) (emphasis added).

{35} Section 32A-2-24 states:

A. A child on probation incident to an adjudication as a delinquent child who violates a term of the probation may be proceeded against in a probation revocation proceeding. A proceeding to revoke probation shall be begun by filing in the original proceeding a petition styled as a "petition to revoke probation". Petitions to revoke probation shall be screened, reviewed and prepared in the same manner and shall contain the same information as petitions alleging delinquency. Procedures of the . . . Act regarding taking into custody and detention shall apply. The petition shall state the terms of probation alleged to have been violated and the factual basis for these allegations.

B. The standard of proof in probation revocation proceedings shall be evidence beyond a reasonable doubt and the hearings shall be before the court without a jury. In all other respects, proceedings to revoke probation shall be governed by the procedures, rights and duties applicable to proceedings on a delinquency petition. If a child is found

24

to have violated a term of the child's probation, the court may extend the period of probation or make any other judgment or disposition that would have been appropriate in the original disposition of the case.

Rule 10-261 NMRA similarly states, in pertinent part:

> B. Revocation of Probation. If the child fails to fulfill the terms or conditions of probation, the children's court attorney may file a petition to revoke probation.
>
> C. Revocation Procedure. Proceedings to revoke probation shall be conducted in the same manner as proceedings on petitions alleging delinquency. The child whose probation is sought to be revoked shall be entitled to all rights that a child alleged to be delinquent is entitled to under law and these rules, except that:
> > (1) *no preliminary inquiry shall be conducted*;
> > (2) the hearing on the petition shall be to the court without a jury;
> > (3) the petition shall be styled as a "Petition to Revoke Probation" and shall state the terms of probation alleged to have been violated and the factual basis for these allegations[.]

Rule 10-261(B), (C) (emphasis added).

**3.  Construction**

{36}  Our review of the Act, regulations, and rules leads us to conclude that the Legislature intended that the statutory right to warnings asserted by Child is not triggered by the circumstances presented here. We explain.

{37}  The Act's provisions concerning "basic rights" begins with the statement, "A child subject to the provisions of the . . . Act is entitled to the same basic rights as an adult, *except as otherwise provided in the Children's Code, including rights provided*

25

*by the . . . Act, except as otherwise provided in the Children's Code.*" Section 32A-2-14(A) (emphasis added). The provisions of the Act (and the regulations and rules) consistently qualify requirements with specific references to "delinquency," "delinquency petition," "delinquent act," and "delinquent child," employing those terms to limit the application of certain requirements. These terms are defined by the Act, regulations, and rules to mean *acts* that "would be designated as a *crime* under the law if committed by an adult," Section 32A-2-3(A) (emphasis added); *a child* determined to have committed such acts, Section 32A-2-3(B); *complaints* alleging such acts, Section 32A-2-7(A); *petitions* alleging such acts, 8.14.2.7(W) NMAC; Rule 10-211(B); and *proceedings* to determine whether a child has committed such acts, 8.14.2.7(B), (C) NMAC.

{38} The Act requires that "[a] person afforded rights under the . . . Act shall be advised of those rights *at that person's first appearance before the court* on a petition under that act." Section 32A-2-14(L) (emphasis added). As to out-of-court circumstances, the Act provides, "No person subject to the provisions of the . . . Act *who is alleged or suspected of being a delinquent child* shall be interrogated or questioned without first advising the child of the child's *constitutional rights* and securing a knowing, intelligent and voluntary waiver." Section 32A-2-14(C) (emphasis added). Thus, the Act requires that a child "who is alleged or suspected of

26

being a delinquent child" may not be questioned unless the questioner first advises the child of his or her "constitutional rights" and secures "a knowing, intelligent and voluntary waiver" of those rights. *Id.* But the Act is also clear that this warning requirement does not apply generally to anyone "subject to the provisions of the . . . Act," which a juvenile probationer is, but only where a child "is alleged or suspected of being a delinquent child." *Id.*

{39} This limitation is also evident in the provisions of the Act, regulations, and rules concerning and defining "preliminary inquiry." As noted, Section 32A-2-7(A) provides that "[c]omplaints *alleging delinquency* shall be referred to probation services, which shall conduct a *preliminary inquiry* to determine the best interests of the child and of the public with regard to any action to be taken." *Id.* (emphasis added); *see* Rule 10-211(A) ("Prior to the filing of a *petition alleging delinquency*, probation services shall complete a *preliminary inquiry* in accordance with the Children's Code." (emphasis added)); 8.14.2.7(Y) NMAC (defining "[p]reliminary inquiry (PI)" as "a conference between the JPO, client, and parent or guardian to assess whether a referral to the CCA should be made to file a *delinquency petition*").

{40} Section 32A-2-7(B) requires that statutory warnings be given at "the commencement of the preliminary inquiry[.]" Section 32A-2-7(B) (stating that "[a]t the commencement of the preliminary inquiry, the parties shall be advised of their

27

basic rights pursuant to Section 32A-2-14" and that "[t]he child shall be informed of the child's right to remain silent"); *see* 8.14.2.9(B) NMAC (stating that "[a]t the commencement of the preliminary inquiry, the [JPO] shall advise the client, parent, guardian, or custodian of the client's basic rights" and enumerating those rights). Again, the Act is clear that the warning requirements do not apply generally to anyone subject to the Act, but only at the commencement of a preliminary inquiry to determine "whether a referral to the CCA should be made to file a delinquency petition." 8.14.2.7(Y) NMAC; *see* § 32A-2-7(A). And Rule 10-261(C)(1), applicable to juvenile probation, provides that "*no* preliminary inquiry shall be conducted" in connection with a petition to revoke probation. (Emphasis added.)

{41}     The Act is equally clear that the requirement that the State "prove that [a] statement or confession offered in evidence was elicited only after a knowing, intelligent and voluntary waiver of the child's constitutional rights was obtained" applies only in proceedings involving an allegation that the child is a delinquent child, and not generally to anyone subject to the Act. Section 32A-2-14(D).

{42}     Although there is no doubt that the Legislature intended the Act to provide certain protections to children greater than those the law affords to adults (including even greater protections to younger children, *see* § 32A-2-14(F)), there is also no doubt that the Act's text indicates a legislative intention to make certain protections

28

available only where a child is suspected or alleged to be a delinquent child. These textual limitations—and the result that statements inadmissible in a proceeding to adjudicate criminal liability may still be admissible in a proceeding to determine whether a probationer has violated conditions of probation—are rational and entirely consistent with the constitutional law concerning criminal defendants, probationers, and juveniles.

{43}     As discussed above, the law recognizes a significant difference between a proceeding to determine whether an already convicted individual has violated a condition of probation, warranting an adjustment of a previously imposed sentence (in juvenile parlance, "disposition"), and a proceeding to determine criminal liability on a new charge; differences recognized by New Mexico courts. *See, e.g.*, *Lopez*, 2007-NMSC-011, ¶ 12 ("By failing to comply with probation conditions, a defendant demonstrates that clemency is not appropriate because he or she is not willing or able to be rehabilitated. It follows that the court must have broad power to adjust a defendant's sentence by revoking probation when necessary."); *Gutierrez*, 1995-NMCA-018, ¶ 3 (noting that protections available in parole and probation revocation proceedings do not include *Miranda*'s requirements).

{44}     The law concerning federal constitutional protections for juveniles also recognizes that constitutional protections afforded juveniles in delinquency

29

proceedings may not be available to an already-convicted juvenile probationer. *See Gagnon*, 411 U.S. at 789 n.12 (describing *Gault* as treating a juvenile "delinquency" proceeding as "functionally akin to a criminal trial" and stating that "[a] juvenile charged with violation of a generally applicable statute is differently situated from an already-convicted probationer or parolee, and is entitled to a higher degree of protection"); *Gault*, 387 U.S. at 30 n.48 (emphasizing that "what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage [to determine delinquency] has no necessary applicability to other steps of the juvenile process").

{45}     The Act's textual limitations are also consistent with the purposes of probation and the role of the JPO in serving those purposes, reflected in the language of the Act and regulations as well as the case law discussed above. *See, e.g.*, *Lopez*, 2007-NMSC-011, ¶ 8 ("The Legislature has granted district courts the power to revoke probation when a probation condition is violated because rehabilitation, which is the primary goal, is not being achieved."); *Rivera*, 2004-NMSC-001, ¶ 24 ("The primary goal of probation, which is defendant rehabilitation, may be defeated by delaying the commencement of a defendant's probationary sentence pending appeal."); *Hermosillo*, 2014-NMCA-102, ¶ 12 ("[P]robation is an act of clemency with the goal of education and rehabilitation[.]").

{46} The Act's stated purposes include "provid[ing] a program of supervision, care and rehabilitation[.]" Section 32A-2-2(A). The regulations define "juvenile probation" as "a court-ordered sanction and disposition which places an adjudicated client under the supervision and care of a [JPO]," 8.14.2.7(T) NMAC, and define "JPO" as "a department staff person who[] provides court-ordered and informal supervision for clients." 8.14.2.7(U) NMAC. The Act, moreover, expressly states that a JPO "does not have the powers of a law enforcement officer." Section 32A-2-5(C). We think it evident that the primary role of the JPO is to supervise juvenile probationers in service of the Act's stated purpose of "provid[ing] a program of supervision, care and rehabilitation," Section 32A-2-2(A), and that the text of Section 32A-2-5(C) reflects a legislative intention that the JPO perform a role in the juvenile justice system separate and distinct from that of law enforcement, a distinction consistent with other statutes providing that rehabilitation is the principal duty of probation and parole officers. *See Rayos v. State ex rel. N.M. Dep't of Corr.*, 2014-NMCA-103, ¶ 19, 336 P.3d 428 (interpreting the adult Probation and Parole Act), *cert. quashed*, 2015-NMCERT-007, 368 P.3d 2.

{47} Child's contention that "[JPOs] are clearly law enforcement" is self-serving and contrary to the statutory and regulatory provisions discussed above. And the broad rule Child advocates could, in most circumstances, undermine, rather than serve, the

31

supervisory and rehabilitative functions of juvenile probation. Child contends that if a JPO "suspects" a juvenile probationer of having committed an act in violation of a probation agreement that might also constitute a delinquent act, the JPO may not question the juvenile about that act without first providing statutory warnings, and that a JPO's failure to give those warnings renders inadmissible in a probation revocation hearing inculpatory statements made by the juvenile to the JPO. That rule is nowhere suggested, let alone stated, in the Act, regulations, or rules. The inevitable consequence of such a rule, moreover, would generally transform the relationship between the juvenile probationer and the JPO into an adversarial one.

{48} Almost any question a JPO asks in the course of supervising a probationer has the potential to elicit an inculpatory statement. And the JPO may have no idea at the moment the question is asked whether the probationer's response might be incriminatory as to a "delinquent act" or merely a basis for probation revocation that does not amount to a delinquent act. Accordingly, if the broad rule Child advocates were adopted, the JPO would be required to give statutory warnings at the commencement of every encounter with the probationer, thereby making every such encounter an adversarial one. Nothing in the Act suggests that the Legislature intended such a result be broadly applied in all probation violation proceedings. To the contrary, our review of the Act, regulation, and rules leads us to conclude that the

32

Legislature intended the relationship between juvenile probationer and JPO to be non-adversarial, and chose to draw the lines and distinctions embodied in the text to reflect that intention.

{49} Our conclusion is not altered by Section 32A-2-24(B)'s statement that (with certain limited exceptions that are not relevant here) "proceedings to revoke probation shall be governed by the procedures, rights and duties applicable to proceedings on a delinquency petition" or the similar statement in Rule 10-261(C), "[p]roceedings to revoke probation shall be conducted in the same manner as proceedings on petitions alleging delinquency." The word "proceeding" as it applies in law is generally understood to refer to "a lawsuit, including all acts and events between the time of commencement and the entry of judgment[,]" more commonly, "[a]ny procedural means for seeking redress from a tribunal or agency." *Proceeding*, *Black's Law Dictionary* (10th ed. 2014). Thus, we understand these statements in the Act and rule to refer to the manner in which trials and hearings are conducted in court and not to events taking place before the commencement of a court proceeding.

{50} In addition to reading these provisions according to the ordinary meaning of "proceeding," *see Bettini v. City of Las Cruces*, 1971-NMSC-054, ¶ 6, 82 N.M. 633, 485 P.2d 967 (stating that "[s]tatutory words are presumed to be used in their ordinary and usual sense"), we see no indication that the Legislature intended this statement

33

in Section 32A-2-24(B) to override every limitation to "delinquency," "delinquent act," and "delinquent child" we have previously identified. And even if the text of the Act (and the regulations and rules) were not plain but ambiguous, statutory-construction principles require that we "consider the policy implications of the various constructions of the statute[,]" *Rivera*, 2004-NMSC-001, ¶ 14; interpret "different legislative enactments as harmonious instead of as contradicting one another," *id.* ¶ 13 (internal quotation marks and citation omitted); construe a statute "so that no part of the statute is rendered surplusage or superfluous[,]" *Javier M.*, 2001-NMSC-030, ¶ 32 (internal quotation marks and citation omitted); "reject[] a formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute[,]" *State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022; and "favor . . . an interpretation driven by the statute's obvious spirit or reason" if adherence to the literal words would lead to "injustice, absurdity or contradiction," *State v. Trujillo*, 2009-NMSC-012, ¶ 21, 146 N.M. 14, 206 P.3d 125 (internal quotation marks and citations omitted). These considerations mandate a reading of Section 32A-2-24(B) and Rule 10-261(C) that applies only to the conduct of court proceedings, consistent with the ordinary meaning of "proceeding."

{51} We are aware of statements in prior cases to the effect that "an allegation of a juvenile probation violation is treated as if it were a charge brought in a delinquency proceeding." *State v. Trevor M.*, 2015-NMCA-009, ¶ 7, 341 P.3d 25 (alteration, internal quotation marks, and citation omitted); *State v. Erickson K.*, 2002-NMCA-058, ¶ 15, 132 N.M. 258, 46 P.3d 1258 (same). Those decisions, however, addressed only the conduct of court proceedings, discussing the applicability of the rules of evidence (*Erickson K.*) and the right of confrontation (*Trevor M.*) at a probation revocation proceeding. *Erickson K.* essentially acknowledged as much, citing Section 32A-2-24 as stating that "probation revocation proceedings [are] to be conducted as outlined in Section 32A-2-16[,]" which governs the "[c]onduct of hearings." *Erickson K.*, 2002-NMCA-058, ¶ 16; *see* § 32A-2-16. Neither case, moreover, addressed rights applicable *before* the commencement of a probation revocation proceeding or involved an asserted right that would burden the administration of the juvenile probation system as would the broad rule advocated by Child in this case. *Cf. Fare*, 442 U.S. at 723 (warning that *Miranda*'s requirements may not be extended in a manner that "would cut [*Miranda*'s] holding . . . completely loose from its own explicitly stated rationale" and "impose the burdens associated with the rule of *Miranda* on the juvenile justice system and the police without serving the interests

35

that rule was designed simultaneously to protect" (internal quotation marks and citation omitted)).

{52} In sum, applying well-settled principles of statutory construction to the facts in this case, we conclude that the broad rule advocated by Child is not required by the Act, regulation, or rules. *See Rivera*, 2004-NMSC-001, ¶¶ 15-24 (construing NMSA 1978, Section 31-11-1(A) (1988) in light of, inter alia, its history, background, function within the comprehensive statutory scheme, including the state's sentencing scheme and probation statutes emphasizing constructive rehabilitation and general policy considerations and concluding that these factors compelled a different construction from that suggested by "[a] literal reading of Section 31-11-1(A) [which] would seriously undermine" rehabilitative goals).

{53} We also conclude that the undisputed facts establish that the information Child's JPO had when she arranged the meeting at which Child made the statements he moved to suppress—reported to her by Child's mother, not law enforcement—were that Child had been suspended from school because an officer had seen him in possession of a pipe and that the JPO did not believe there was a basis for "a new charge," i.e., a delinquent act forming the basis for a delinquency petition, that was separate and distinct from a probation revocation petition. We emphasize that there is no evidence that the JPO arranged for the meeting because she

36

"suspected" that Child had committed a new delinquent act, as opposed to a violation of a condition of his probation, and that the revocation petition did not allege that Child had committed a new delinquent act but only that Child had violated several conditions of his probation. Law enforcement was not present when the JPO questioned Child about what Child's mother had reported to her. Nor is there any evidence that the officer who had seen Child in possession of a pipe arrested him, or that a petition was considered or potentially being filed alleging a new charge of delinquency based on the conduct cited in the revocation petition.

**3.      Case Law Supports Our Interpretation of the Act**

{54}      Our interpretation of Section 32A-2-14 is supported by recent decisions of our Supreme Court that make clear that, although Section 32A-2-14 provides broad protection for juveniles suspected or alleged to have committed a delinquent act, those protections are limited by the Act's text.

{55}      In *Javier M.* our Supreme Court affirmed its understanding that "[c]ustodial interrogation occurs when 'an individual is swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion so that the individual feels under compulsion to speak,' " 2001-NMSC-030, ¶ 15 (alterations omitted) (quoting *Miranda*, 384 U.S. at 461); that "[c]ustodial interrogation was the essential predicate to the Court's decision in *Miranda*[,]" *id.*

37

¶ 42; and that "[i]n the absence of custodial interrogation an officer is not constitutionally mandated to give any warnings." *Id.* While concluding that *Miranda* did not apply to the police officer's detention of the child in that case because the detention "did not rise to the status of a custodial interrogation[,]" *id.* ¶¶ 21-23, the Court held that Section 32A-2-14(C) does not require that a child "be subject to custodial interrogation in order to be afforded the right to be advised of his or her constitutional rights prior to police questioning[,]" *Javier M.*, 2001-NMSC-030, ¶ 29, because "Section 32A-2-14 is not a mere codification of *Miranda*, but was intended instead to provide children with greater statutory protection than constitutionally mandated." *Javier M.*, 2001-NMSC-030, ¶ 32.

{56}    Significantly, *Javier M.* also made clear that Section 32A-2-14's protections are limited. Section 32A-2-14(C) "only protects against a child's statements which are made during an investigatory detention in response to a police officer's questioning that could not be mere administrative questions and that is intended to confirm or dispel the officer's suspicions that the child is or has committed a delinquent act[,]" and where a child is subject to such investigatory detention, Section 32A-2-14(C) requires the officer to advise the child, prior to questioning him, only of his right to remain silent and that anything he says may be used against him. *Javier M.*, 2001-NMSC-030, ¶¶ 40-41. Section 32A-2-14's protections, moreover, are

38

triggered only "in two circumstances: (1) after formal charges have been filed against a child; and (2) when a child is seized pursuant to an investigatory detention and not free to leave." *Javier M.*, 2001-NMSC-030, ¶ 38. *Javier M.* concluded that the Legislature did not intend to "hamper the traditional function of police officers in investigating crime[,]" and rejected a proposed "standard of requiring warnings whenever an officer asks a question which is likely to lead to an incriminating response" as "a standard [that] unduly burdens a police officer's required duties." *Id.* ¶ 39. It also held that "[a]s a prerequisite to requiring that a child be advised of his or her rights under Subsection (C), the [c]hild must be either 'alleged' or 'suspected' of being a *delinquent child.*" *Id.* ¶ 34 (emphasis added); *see* § 32A-2-14(C) ("No person subject to the provisions of the . . . Act who is alleged or suspected of being a delinquent child shall be interrogated or questioned without first advising the child of the child's constitutional rights and securing a knowing, intelligent and voluntary waiver.").

{57}  In sum, the analysis in *Javier M.* makes clear that Section 32A-2-14(C)'s requirements are triggered, not by a JPO's suspicion that a probationer may have violated a condition of probation or where the child is alleged in a revocation petition to have done so, but only where a law enforcement officer questions a child based on a suspicion that the child has committed a "delinquent act" or where the child is

39

alleged to have done so in a delinquency petition. *See Javier M.*, 2001-NMSC-030, ¶ 47 ("By enacting Section 32A-2-14, we conclude that the Legislature intended to exempt children from the general rule of self invocation by requiring that children be reminded of their right not to incriminate themselves and be advised of the consequences of waiving that right. Accordingly, we conclude that when a child is *subject to an investigatory detention*, *law enforcement* must advise the child of his or her right to remain silent and that if the right is waived anything that the child says can be used against them in any *delinquency hearing*." (emphasis added)). To the extent Child contends that *Javier M.* mandates the rule he advocates, he is mistaken. As discussed above, law enforcement did not question Child and was not even present when the JPO questioned Child. Nor does this case require us to decide whether Child's statements would be admissible in a delinquency proceeding, as distinct from a probation revocation proceeding.

{**58**}     Child cites *Antonio T.*, 2015-NMSC-019, ¶ 20, in support of his contention that "[t]here are no exceptions based on which State actor elicited the statement or at what type of proceeding: if the child was suspected of a delinquent act and not free to leave, the State must *always* prove a voluntary, knowing, and intelligent waiver." Child's reliance on *Antonio T.* is also misplaced under the facts in this case.

{59} In *Antonio T.*, two teachers escorted the child, a seventeen-year-old high school student, to the assistant principal's office on the suspicion that he had consumed alcohol. *Id.* ¶¶ 2, 4. The principal questioned the child about his possession of alcohol in the presence of the student resource officer, a certified law enforcement officer in full uniform. *Id.* ¶ 4. While the principal questioned the child, asking the kinds of questions she routinely asked in performing her job enforcing discipline at the school, the officer prepared a breath alcohol test a few feet away from the child. *Id.* ¶ 5. Although the officer usually questioned students suspected of drinking alcohol before administering a breath test, he just listened because the principal asked questions he would have asked. *Id.* The child admitted that he had consumed alcohol, that he had brought the alcohol to school in a plastic bottle, and that he had disposed of the bottle in a bathroom trash can. *Id.*

{60} While the officer administered the breath test, the results of which corroborated the child's confession, the principal searched the child's backpack and found a pocketknife. *Id.* ¶ 6. At the principal's request, the officer searched for the plastic bottle but could not find it. *Id.* ¶ 7. When he returned, he advised the child of his constitutional *Miranda* rights. *Id.* The child then answered the officer's questions about the knife but refused to answer his questions about alcohol consumption. *Id.* The statements the child made in response to the principal's questions were

41

documented in the officer's police report under the heading "investigation." *Id.* The state later charged the child with possession of alcoholic beverages by a minor—a delinquent act. *Id.* ¶ 3. In his subsequent delinquency proceeding, the child moved to suppress his inculpatory statements on the ground that they were elicited without a knowing, intelligent, and voluntary waiver of his right to remain silent, citing Section 32A-2-14(D). *Antonio T.*, 2015-NMSC-019, ¶ 8.

{61} Our Supreme Court reversed the district court's decision (affirmed by this Court) denying the motion, holding that "a school official may insist that a child answer questions for purposes of school disciplinary proceedings" but that statements elicited by a school official "in the presence of a law enforcement officer may not be used against the child in a delinquency proceeding unless the child made a knowing, intelligent, and voluntary waiver of his or her statutory right to remain silent." *Id.* ¶ 3 (citing Section 32A-2-14(C), (D)). The Court concluded that the officer's "mere presence during [the principal's] questioning of [the child] subjected [the child] to an investigatory detention that triggered the statutory protections provided by Section 32A-2-14(C) and (D)." *Antonio T.*, 2015-NMSC-019, ¶ 11. Accordingly, Section 32A-2-14(C) required the officer "to advise [the child] that he had a right to remain silent, and that if [the child] waived the right, anything he said could be used against him in criminal delinquency proceedings[,]" and the officer's failure to do so before

42

the principal questioned the child in his presence rendered the child's incriminating statements inadmissible under Section 32A-2-14(D). *Antonio T.*, 2015-NMSC-019, ¶ 11.

{62}     The Court made clear that, although the principal suspected the child of being intoxicated at school and that this conduct constituted "a school disciplinary violation that would also render him a delinquent child[,]" the principal's suspicion and investigation into the child's alcohol consumption were insufficient to trigger Section 32A-2-14(C), "because [the principal] is neither a law enforcement officer nor was she acting as an agent of law enforcement." *Antonio T.*, 2015-NMSC-019, ¶ 24. "Questioning a child for school disciplinary matters is distinguishable from questioning a child for suspected criminal wrongdoing[,]" the Court explained, and "[b]ecause maintaining security and order in schools requires a certain degree of flexibility in school disciplinary procedures, we recognize the value of preserving the informality of the student-teacher relationship." *Id.* (emphasis, alteration, internal quotation marks, and citation omitted). The principal "was entitled to act on her suspicion and compel answers from [the child] for the purposes of school discipline[,]" and "[a]bsent any agency relationship between school officials and law enforcement authorities, interrogating [the child] alone in her office about school disciplinary matters would not have constituted an investigatory detention." *Id.*

43

{63} Section 32A-2-14(C) was triggered in *Antonio T.*, not because a school official suspected and investigated conduct in violation of school rules, but because the presence of law enforcement during a school official's questioning about the conduct of a juvenile that the law enforcement officer knew constituted a delinquent act "created a coercive and adversarial environment that does not normally exist during interactions between school officials and students[,]" 2015-NMSC-019, ¶ 25; "converted the school disciplinary interrogation into a criminal investigatory detention," *id.* ¶ 26; and granted the law enforcement officer "access to evidence necessary to prosecute criminal delinquent behavior[,]" *id.* ¶ 27. The Court emphasized that its holding "should not be construed to require school administrators to advise a child of his or her right to remain silent in order to use incriminating statements elicited from the child against that child in school disciplinary proceedings." *Id.* ¶ 32; *see State v. Tywayne H.*, 1997-NMCA-015, ¶ 13, 123 N.M. 42, 933 P.2d 251 ("[T]here is a sharp distinction between the purpose of a search by a school official and a search by a police officer. The nature of a . . . search by a school authority is to maintain order and discipline in the school. The nature of a search by a police officer is to obtain evidence for criminal prosecutions." (internal quotation marks and citation omitted)).

{64} Contrary to Child's apparent assumption, *Antonio T.* does not require suppression of Child's inculpatory statements to his JPO in probation revocation proceedings. Indeed, the reasoning of *Antonio T.* supports our conclusion that statements inadmissible in a delinquency proceeding may nonetheless be admissible in a probation revocation proceeding. It also supports our conclusion that the JPO's questioning in this case was in furtherance of her non-adversarial supervisory role and not for the purpose of collecting evidence to be used to support a new charge of a delinquent act. However, the rationale of *Antonio T.* will need to be addressed where the JPO's inquiries were prompted by a request from law enforcement, the facts establish that the JPO was acting as an agent of law enforcement to investigate a new delinquent act, or if law enforcement was present during the questioning of a child. In that circumstance, whether statements made by a child are admissible in a new delinquency proceeding will involve a different analysis. This case does not require us to decide whether Child's statements would be admissible in a delinquency proceeding; the record shows that law enforcement played no role in the JPO's questioning of Child; and the JPO testified that at the time of the questioning, no new criminal charge was contemplated.

{65} Under the rule Child advocates, because a child might be suspected or alleged to have committed a delinquent act, depending on his or her answer to almost any

45

question a JPO might ask, the JPO must *always* treat every child as if he or she might be suspected of having committed a delinquent act, thereby transforming a relationship intended to be rehabilitative, at least in part, into an adversarial relationship between law enforcement and suspect. If this is what the Legislature intended, it would not have written the Act as it did. There would be no point, for example to a provision stating that juvenile probation officers do not have the powers of law enforcement officers.

{66} We conclude that fidelity to legislative intent in this instance requires that we interpret the Act in a manner that preserves, rather than ignores, the lines previously drawn by the Legislature in distinguishing delinquency from probation revocation and the role of a JPO from the role of a law enforcement officer, and the lines previously drawn in the case law concerning the circumstances required to trigger Section 32A-2-14. Respect for these distinctions requires no more than acceptance that some incriminating statements that may be inadmissible in delinquency proceedings (to adjudicate criminal liability on a charge for which the probationer has not been prosecuted) are admissible in probation revocation proceedings. This result is rational and consistent with the Act's text and prior case law. We do not hold that a JPO is never required to give warnings under the Act, only that, under the

circumstances presented here, the JPO's failure to give warnings did not render Child's incriminatory statements inadmissible in a probation revocation proceeding.

**CONCLUSION**

{67} We reverse and remand.

{68} **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**TIMOTHY L. GARCIA, Judge**